IDA M. HERNÁNDEZ Y OTROS, demandantes y recurridos, *v.* MÉNDEZ & ASSOCIATES DEVELOPMENT CORP. Y OTROS, demandados y recurrentes.

*Número:* R-75-383     *Resuelto:* 15 de septiembre de 1976

*Dubón & Dubón,* abogados de los recurrentes; *B. Quiñones Elías y S. Quiñones Elías,* abogados de los recurridos.

El Juez Asociado Señor Díaz Cruz emitió la opinión del Tribunal.

Los hechos no cuestionados que han dado lugar a solicitud de sentencia sumaria por ambas partes, son que los recurridos compradores de viviendas de la Urb. Reparto El Maestro, de Camuy, suscribieron en el año 1970 contratos con la urbanizadora Méndez & Associates Development Corp. en virtud de los cuales ésta se obligó a construir y vender a Ida M. Hernández, casa en solar de 315 m/c por precio de $14,350, del cual depositó $950 con la vendedora; a Cecilio W. Hernández casa en solar de 315 m/c por precio de $15,000 del cual depositó $1,000; a Jesús M. Quiñones casa en solar de 315 m/c por precio de $14,300 del cual depositó $4,300 y a Enrique Díaz (por cesión de Angel Rivera), casa en solar de 361.93 m/c por precio de $15,500 del cual depositó $1,500. La Constructora Méndez & Associates Development fracasó en el proyecto sin haber cumplido dichos contratos, y Berens Mortgage Bankers, Inc., acreedora de Méndez & Associates, salió al rescate del proyecto a cuyos fines organizó una corporación llamada Stargus Properties, Puerto Rico Inc., que por escritura pública de 18 de marzo de 1970 compró sin transferencia de dinero, figurando como precio obligaciones hipotecarias de la vendedora por más de $500,000.00. Ninguna mención se hizo en dicha escritura respecto a los contratos de promesa de venta con los recurridos que Méndez & Associates no había cumplido. Cuando los compradores de vivienda exigieron a Stargus y Berens el cumplimiento de dichos contratos, amparándose ambas en que ninguna relación contractual tienen con dichos compradores, Berens negó que se hubiera hecho cargo de continuar y terminar las obras de la Urbanización Reparto El Maestro, y Stargus les informó que les entregaría las viviendas bajo condiciones y términos distintos a los pactados originalmente con Méndez

& Associates. La sala de instancia estimó probado que existe completa identidad entre Berens y Stargus, siendo ésta una criatura de la primera, que ninguna puede levantar su condición de tercero registral para derrotar la eficacia de los contratos no inscritos de los compradores de casas recurridos "dado el conocimiento que tenían, o que venían obligados a tener, de la realidad sobre el terreno ... [ya que] al momento de hacer la adquisición la Stargus Properties, Puerto Rico Inc., existían signos evidentes sobre el terreno que no podían ignorar; (1) [que] [la] Berens Mortgage Bankers, Inc. era la institución financiadora de Méndez & Associates, y cuando surge la transacción con la Stargus Properties, Puerto Rico Inc., ya existían casas y carretera en los terrenos, y tenían que saber, o deberían haber investigado, los compromisos usuales y corrientes que se llevan a cabo en esta clase de desarrollo de terrenos." Y añade el juzgador "No nos cabe duda que al momento de hacerse la adquisición, o sea, al momento de manifestarse el consentimiento entre la Stargus Properties, Puerto Rico Inc. y Méndez & Associates Corporation, no existía el elemento de buena fe esencial a la defensa de terceros registrales." *Ruidíaz Barrios* v. *Salas*, 103 D.P.R. 922 (1975).

Con dichos fundamentos, el Tribunal Superior dictó sentencia declarando con lugar la moción de sentencia sumaria de los compradores de casas demandantes, imponiendo a Berens y Stargus, como continuadoras del proyecto de urbanización, responsabilidad por los contratos o compromisos de construcción y venta de casas suscritos por Méndez & Asso-

---

(1)"En la adquisición de un bien inmueble por un precio cierto es menester ejercer cierto grado razonable de diligencia en el acto de comprar. '[L]a Ley presume, y no sin lógica, que el comprador pudo, antes de perfeccionar el contrato, cerciorarse de la extensión y de la calidad del inmueble que trataba de adquirir. Si no lo hizo, si aún haciéndolo nada objetó y consintió en la adquisición, a nadie podrá imputar su propia culpa . . . .' Scaevola, *Código Civil*, Tomo XXIII, Volumen II, Madrid (1970), pág. 82." *Ruidíaz Barrios* v. *Salas*, 103 D.P.R. 922 (1975).

ciates. Recurrieron Stargus y Berens y expedimos auto de revisión.

No hay indicio alguno en la prueba de que Stargus adquiriera el proyecto de urbanización en un plan para defraudar a los compradores que tenían contratos con Méndez & Associates. La cesión y traspaso sobreviene después de un pleito en que Berens reclamaba de Méndez cuantiosas sumas de dinero prestado. La realidad de ser dicha transacción una genuina y de buena fe pesa en la solución que damos al recurso.

En el Estado Libre Asociado de Puerto Rico, como en toda sociedad civilizada, hay un eminente interés social en proteger y fomentar la adquisición por cada familia de una vivienda segura, cómoda y adecuada. Ese interés social, instrumentado por una consistente política pública, tiene claros perfiles en la profusa legislación[2] aprobada a lo largo de los años en la que figuran con significativo relieve leyes creando el Departamento de la Vivienda, implementando programas para distribución de parcelas, construcción de casas y otorgamiento de títulos de propiedad; de rehabilitación o eliminación de arrabales y construcción de caseríos y multipisos, regulando la propiedad en condominio, concedien-

---

[2] En el extenso cuerpo de legislación se destacan la Ley de Tierras de Puerto Rico (Núm. 26 de 12 de abril, 1941); Ley Núm. 27 de 12 de abril, 1941, estableciendo la política pública en protección del hogar seguro; Ley Núm. 264 de 14 de mayo, 1945, para eliminar arrabales; Ley Núm. 90 de 22 de junio de 1962, autorizando a la CRUV a adquirir terrenos para desarrollo de condominios de bajo costo; Ley Núm. 130 de 13 de junio, 1967, creando la oficina del oficial de construcción; Ley Núm. 35 de 14 de junio, 1969, concediendo título de propiedad a parceleros; Ley Núm. 97 de 10 de junio, 1972, creando el Departamento de la Vivienda; Ley Núm. 1 de 11 de julio, 1972, asignando fondos para el desarrollo de un plan de comunidades rurales mediante distribución gratuita a personas de escasos recursos, de solares y materiales de construcción; Ley Núm. 10 de 5 de julio, 1973, estableciendo un subsidio de intereses de hipotecas sobre hogares; Ley Núm. 3 de 14 de noviembre, 1974, concediendo exención total de contribución sobre la propiedad por tres años para adquirentes de viviendas; Ley Núm. 24 de 8 de junio, 1962, eximiendo de contribución sobre la propiedad toda vivienda hasta la cantidad de $15,000 dentro de su valor tasado.

do exención contributiva al dueño de vivienda e incentivo mediante un período de exención a los nuevos adquirentes y a los constructores.

■ La libertad de contratación privada no es irrestricta. Está atemperada y refrenada en el propio Art. 1207 del Código Civil (31 L.P.R.A. sec. 3372) (³) cuando declara que "Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público." "Orden público" es el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. El concepto orden público recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. *Wiley* v. *Livingston*, 376 U.S. 543, 549–50 (1964). En gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero que aun sin esa expresa declaración legislativa, constituyen principios rectores de sabio gobierno nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin por el estilo de una sociedad. Castán ve tanto en la costumbre como en la ley el modo de manifestación de la voluntad social predominante. *Derecho Civil*, Tomo 1, Vol. 1º, Décima Edición (1962), pág. 335.

El principio de autonomía de la voluntad de los contratantes está consagrado en el Art. 1207 del Código Civil pero con las limitaciones que establece. "El orden público [dice Manresa] que no significa [cuando se habla de contratos] el material mantenimiento de la paz pública, representa el interés público, social y de ley en el Derecho privado, lo permanente y esencial de las instituciones, lo que aún favore-

_____

(³) Y por el Art. 1069 (31 L.P.R.A. sec. 3044) que declara: "Las condiciones imposibles, las contrarias a las buenas costumbres y las prohibidas por la ley, anularán la obligación que de ellas dependa. La condición de no hacer una cosa imposible se tiene por no puesta."

ciendo a algún individuo en quien se concreta el derecho, no puede quedar a su arbitrio . . . . La evolución jurídica camina decididamente hacia una infiltración cada vez mayor de elementos éticos y sociales, de tono imperativo que de modo general en absoluto disciplinaran las relaciones de derecho privado, imprimiéndoles carácter público a expensas del principio de autonomía de la voluntad que, de esta suerte, va perdiendo volumen en su clásica y amplia esfera de acción. (S. 2 de abril de 1946.)" Manresa, *Comentarios al Código Civil Español*, Tomo 8, Vol. 2, Sexta Ed. (1967), págs. 381 y 383.

■ Ya este Tribunal rechazó como inválida, por ser contraria al orden público (⁴) la modificación o renuncia al plazo decenal de garantía fijado por el Art. 1483 del Código Civil (31 L.P.R.A. sec. 4124) aun cuando por no prohibirla la ley pareciera una convención propia de intereses privados. Al así decidir, coincidimos con el criterio de los comentaristas, entre ellos Scaevola así resumido: ". . . [L]a libertad de estipular está coartada por los fueros de la moral y el interés públicos. Si el pacto a que nos estamos refiriendo fuese válido por él resbalarían todas las complacencias de un arquitecto despreocupado para con un dueño codicioso, y la seguridad y el interés públicos quedarían faltos de la garantía que implica la responsabilidad personal de un técnico director y de un empresario constructor. Por esta consideración, pensamos que el pacto por el cual el dueño renuncia al plazo de garantía es inmoral, contrario al público interés, y, por consiguiente, nulo, pudiendo ejercitar la acción de nulidad los obligados principal o subsidiariamente en virtud del contrato de obra. (24 Scaevola, págs. 109 a 111.)" *González* v. *Agos-*

---

(⁴) El Siglo XIX que influido por Hegel experimentó la eclosión de la libertad individual encaminada a fronteras invisibles, por un tiempo relegó a segundo plano los intereses sociales y llamó la política pública "caballo indómito que una vez usted lo monta no sabe a dónde lo llevará." Y apunta el Prof. Pound que en realidad esa actitud hacia la política pública no era en sí otra cosa que la expresión de una política pública. Pound, *Jurisprudence*, Tomo III, pág. 272.

*tini*, 79 D.P.R. 510, 516–17 (1956). Esa presencia de un interés público dominante en los contratos entre constructores y compradores de casas fue reconocida recientemente por este Tribunal al dictaminar: "Debemos tener presente que el Art. 1485 [del Código Civil], al igual que otros que tratan de la responsabilidad del contratista, hay que analizarlo . . . en armonía con la tendencia filosófica plasmada en las leyes promulgadas para proteger al consumidor de prácticas y sutilezas, aparentemente legales, pero que entrañan el germen y vicio de la ilegalidad y la inmoralidad." *Hernández Denton* v. *Western Pines Corp.*, 103 D.P.R. 741 (1975).

■ La cesión y traspaso del proyecto por Méndez & Associates a Stargus, sin hacer reserva respecto a los derechos de los compradores de vivienda con contratos firmados y anticipos de precio entregados en depósito, es contraria al orden público pues alienta el incumplimiento de obligaciones contractuales y propicia la especulación en busca de mayor precio([5]) por unidades de vivienda ya comprometidas. Los compradores de casa estarían en riesgo no ya de ser burlados en su legítima ambición de tener un hogar propio, sino de perder el anticipo o inversión original que se le exige con el compromiso de venta por la constructora, si al fracasar ésta, o aun sin fracasar, decidiera vender a un tercero que pretendiera desentenderse de toda obligación hacia aquéllos([6]) porque no fue parte de los contratos originales ni asumió responsabilidad por los mismos; y culminar esta operación con barniz legalista de libertad de contratación, en oferta de entregar las casas bajo nuevas condiciones y términos. El

---

([5]) Tanto el Art. 1485 del Código Civil, como la ley del oficial de construcción, que es la Núm. 130 de 13 de junio de 1967, en su Art. 10(c)(1) (17 L.P.R.A. sec. 510) prohíben el aumento del precio ajustado o convenido.

([6]) Sólo el consumidor quedaría desamparado. Las acreencias de las financieras están bien garantizadas con hipotecas que persiguen el inmueble sin que el nuevo adquirente pueda sacudirse de ellas. También están asegurados por fianza los salarios de trabajadores y los créditos de suplidores de materiales.

desenlace repugna a los principios de moral y orden público que enaltecen nuestra sociedad. *Cf. Hernández Denton* v. *Western Pines Corp.,* supra. El comprador, cesionario o adquirente sucesor de un proyecto de viviendas en urbanización o condominio, por razón de orden público, se subroga por el vendedor en todos los contratos en vigor para la venta de viviendas y viene obligado por sus términos. *Cf. Wiley* v. *Livingston,* supra.

Procede ahora analizar dichos pactos originales. No había impedimento para la cesión o transferencia de los contratos de compraventa por la urbanizadora original Méndez & Associates a Stargus, pues a ello consintieron los compradores de casas en la Cláusula Séptima que transcribimos:

"Queda convenido entre las partes que el Contrato es personal e intransmisible, y que no podrá ser enajenado, pignorado, cedido, vendido, ni en forma alguna transferido a favor de terceras personas, excepto con el expreso consentimiento por escrito de la VENDEDORA."

En lenguaje amplio dichos contratos limitaron la responsabilidad de Méndez & Associates, en caso que no le fuere posible entregar las viviendas en plazo de un año, a la devolución de los depósitos o anticipos de precio hechos por los compradores recurridos. Dicha cláusula que tiene virtualidad y efecto de resolución pactada, [7] provee:

"DECIMOTERCERA: Si dentro del término de un año a partir de la fecha de este Contrato no le fuere posible a la VENDEDORA entregar al COMPRADOR la propiedad a que se ha hecho referencia; o si la terminación de la construcción es impedida por una emergencia nacional, o por restricciones o reglamentaciones

---

[7] La condición resolutoria acordada por los contratantes es válida. *Clausells* v. *Salas,* 51 D.P.R. 89, 94-95 (1937). La Ley del Oficial de Construcción (Núm. 130 de 13 de junio de 1967) dispone en su Art. 10(g)(4), (17 L.P.R.A. sec. 510(g)(4)) que en los casos de resolución de contratos de opción por parte del urbanizador o constructor, los contratantes se atendrán a lo dispuesto en el contrato en cuanto a la penalidad o daños líquidos se refiere.

gubernamentales, o por actos de la naturaleza fuera del control de la VENDEDORA, como por ejemplo, inclemencias del tiempo o por falta de materiales de construcción; por razones ajenas a la VENDEDORA tales como huelgas, etc., o por dificultades especiales que surjan con el personal de la VENDEDORA, o por cualquier otra razón de naturaleza similar, la VENDEDORA podrá devolver al COMPRADOR la suma depositada por éste, entendiéndose que aparte de la devolución del depósito no habrá responsabilidad ulterior alguna por parte de cualquiera de los contratantes, inclusive no habrá responsabilidad en lo referente al cumplimiento específico de este Contrato y/ daños y perjuicios."

La prueba no demuestra que Stargus fuera una compradora ávida de hacer un buen negocio. Por el contrario, su entrada en esta relación contractual, y hasta su creación misma como entidad corporativa, respondió al legítimo interés de Berens en proteger su acreencia de más de medio millón de dólares en una entidad al borde del colapso económico. No es equitativo imponer a la sucesora Stargus el cumplimiento de contratos que son parte del plan general o diseño económico que causó el fracaso de Méndez & Associates y que le impidió honrar el compromiso de entregar las casas en término de un año. La subrogación en igualdad de condiciones da a Stargus la opción que los compradores concedieron a Méndez & Associates de resolver los contratos mediante devolución de los depósitos. Coincide esta alternativa con la resolución autorizada mediante restitución total de la inversión de los compradores de casas con defectos insalvables que exigen demolición de las estructuras y construcción nueva. *De Jesús* v. *Ponce Housing Corp.*, 104 D.P.R. 885 (1976).

Bajo dicha cláusula resolutoria, las recurrentes quedan relevadas del cumplimiento específico de los contratos de compraventa concertados por su antecesora y cedente Méndez & Associates pero deben devolver a dichos compradores de viviendas el importe de sus depósitos e intereses al tipo legal.

*Se eliminará la disposición de la sentencia revisada que impuso el cumplimiento específico, ahora sustituido por reso-*

158

*lución de contrato y restitución de inversión, y así modificada dicha sentencia será confirmada.*

El Juez Presidente Señor Trías Monge concurre en el resultado.

