GENERAL ELECTRIC CREDIT & LEASING CORPORATION OF PUERTO RICO, demandante y recurrida, *v.* SOUTHERN TRANSPORT & OIL DISTRIBUTING CORPORATION, MARIO O. GARCÍA QUINTERO, ANUNCIATA INCERA DE GARCÍA, ESTEBAN NAZARIO y JULITA CASTILLO DE NAZARIO, demandados y recurrentes.

*Números:* RE-88-404
RE-88-402

*Resueltos:* 22 de febrero de 1993

*Luis Roberto Santos*, de *Santos y Báez*, y *José M. Biaggi Junquera*, abogados de los demandados y recurrentes; *Sheila I. Morales Fournier* y *Carlos M. Rivera Vicente*, de *Cancio, Nadal y Rivera*, abogados de la demandante y recurrida.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

El 22 de abril de 1981, la General Electric Credit & Leasing Corporation of Puerto Rico (General Electric) otorgó un préstamo a la Southern Transport & Oil Distributing Corp. (Southern Transport) por la cantidad de ochenta mil ciento treinta y seis dólares con cincuenta centavos ($80,136.50), más los intereses correspondientes en conformidad con los términos y las condiciones del pagaré suscrito a favor de General Electric en esa misma fecha. Dicho préstamo fue obtenido por la Southern Transport con el propósito de cubrir el pago del balance del precio de compraventa de seis (6) camiones de arrastre adeudado al señor Esteban Nazario (Nazario). Para asegurar el pago de dicho préstamo, la Southern Transport constituyó hipoteca a favor de General Electric sobre nueve (9) camiones de su propiedad. Simultáneamente, Nazario y su esposa, la Sra. Julita Castillo de Nazario, y el Sr. Mario García Quintero (García) junto con su esposa, la Sra. Anunciata Incera de García, firmaron sendos documentos de fianza (*Guaranty*) en los que garantizaban personalmente el pago de la deuda a General Electric.([1]) Ambos documentos disponían del modo siguiente:

> ... [T]o acquire a Chattel Mortgage dated April 22, 1981 with Southern Transport Oil Distributing Corp. and for other good and valuable consideration, the undersigned guarantee to you the regular and prompt payment and performance of any sum or sums of money and all obligations of the Mortgagor in accordance with, under and pursuant to the Chattel Mortgage.
>
> Notice of acceptance of this Guaranty and of any default by Mortgagor is hereby waived. Presentment, protest, and demand, and dishonor are hereby waived. *The extension of the time of payment, or the renewal, or the extension of the time of performance, or any other indulgence granted to Mortgagor and or any primary or secondary obligors and all settlements, com-*

---

([1]) Surge de los autos que todos estos garantizadores eran accionistas de Southern Transport.

*promises, compositions, accounts stated and agreed balances made in good faith between any primary and secondary obligors and of the Mortgagor shall be binding upon the undersigned.* This Guaranty is a continuing one and shall remain in full force and in effect until the aforesaid obligations of Mortgagor under the Chattel Mortgage have been completely satisfied and discharged by payment or performance or both. This Guaranty shall not be impaired in any way by the dissolution, discontinuance of business, liquidation, merger or sale of the Mortgagor. Undersigned waive exercise of possessors, foreclosure or other remedies by you against Mortgagor.

This Guaranty shall bind the undersigned's administrators, representatives, executors and assigns, and the benefits thereof shall extend to and include yours successors and assigns.

IN WITNESS THEREOF, This Guaranty is executed the day and year above written. (Énfasis suplido.) Petición de revisión, Apéndice, pág. 45.

Aunque García otorgó el pagaré hipotecario en su carácter de Presidente de Southern Transport, la fianza fue otorgada en su carácter personal.

Como consecuencia de la falta de pago del principal, el cual se había reducido a la cantidad de $61,787.28, más los intereses devengados, la General Electric instó una acción en cobro de dinero ante la Sala de Mayagüez del Tribunal Superior de Puerto Rico. Para asegurar la efectividad de la sentencia que finalmente pudiera recaer a su favor, la General Electric procedió a embargar cuatro (4) de los camiones hipotecados.

La Southern Transport se acogió a la protección del Tribunal de Quiebras bajo el Capítulo 7 del Código de Quiebra federal. La General Electric y el síndico nombrado por el Tribunal de Quiebras acordaron la cesión a la primera de los cuatro (4) camiones embargados. La correspondiente estipulación aprobada por el tribunal de instancia, en sus párrafos quinto y sexto, disponía lo siquiente:

5. Que la parte demandante y la Southern Transport & Oil Distributing Corporation han llegado a un acuerdo mediante el cual la codemandada Southern Transport & Oil Distributing Corporation traspasa el título legal de los camiones arriba men

cionados a favor de la parte demandante para que ésta pueda proceder a la venta de los mismos y reducir así la cantidad que se obtenga en la venta del monto total de la deuda que aquí se reclama. A cambio del traspaso del título legal de esta propiedad mueble la parte aquí compareciente renuncia con perjuicio la reclamación que ha instado en el presente caso en contra de Southern Transport & Oil Distributing Corporation.

6. La parte demandante, sin embargo, no renuncia al derecho que tiene a continuar esta acción para lograr el pago total de la deuda en contra de los demás co-demandados solidarios: Mario O. García Quintero, Anunciata Incero [sic] de García, Esteban Nazario y Julita Nazario, todos garantizadores personales de la deuda por la cual aquí se reclama. La parte demandante expresamente se reserva el derecho de continuar su causa de acción en contra de los demás co-demandados antes mencionados hasta lograr el pago total de la deuda reclamada más los gastos e intereses que dispone la ley y que surgen de los documentos de garantía y pagaré emitidos por los demandados. En otras palabras, y para dejar expresamente clara la intención de la parte demandante en este acuerdo, la parte demandante habrá de continuar su acción de cobro de dinero en contra de los demás codemandados y no debe entenderse bajo ninguna circunstancia que los acuerdos llegados en esta estipulación en sentido alguno implican renuncia de derecho alguno de la parte demandante contra los demás co-deudores. Petición de revisión, Apéndice, págs. 19–20.

Los codemandados, esposos Nazario-Castillo y esposos García-Incera, no fueron partes en esta estipulación ni en las negociaciones conducentes a la misma. Tanto la estipulación como la orden dictada por el tribunal en la que se aprobó la misma fueron notificadas a todas las partes, incluyendo a dichos esposos codemandados, por conducto de sus respectivos abogados.

La General Electric vendió los cuatro (4) camiones objeto de la estipulación, a Guaraguao Truck Sales, Inc., por el precio total de $22,000. La General Electric procedió a abonar dicha suma a la deuda reclamada en su demanda y continuó su causa de acción en contra de los esposos Nazario-Castillo y García-Incera para recobrar el balance de tal deuda.

Habiendo fallado el tribunal en contra de dichos codemandados, nos han solicitado éstos, por separado, la revisión de la sentencia dictada. Hemos consolidado ambos recursos a los fines de la consideración de los mismos.

A solicitud de los codemandados, revisamos.

## I

En síntesis, aducen los demandados recurrentes que, como resultado de la transacción efectuada entre acreedor —General Electric— y deudor original —Southern Transport— se extinguió la obligación accesoria suscrita por ellos mediante el contrato de garantía. Alegan, además, que está presente en este caso la figura de la dación en pago o *datio in solutum*, por lo que tuvo lugar la novación extintiva de la obligación principal.

Como punto de partida, es imprescindible explicar la naturaleza de la obligación contractual que vincula a los demandados recurrentes con los hechos en controversia. Se trata del contrato de fianza al cual hicimos referencia anteriormente. Los contratos de garantía o afirmación de derechos son aquellos que "tienen por fin asegurar el cumplimiento de una o varias obligaciones principales o afirmar y esclarecer derechos que hayan sido controvertidos". J. Castán Tobeñas, *Derecho Civil español, común y foral*, 11ma ed., Madrid, Ed. Reus, 1981, T. 4, págs. 742–743. Entre ellos se encuentra el contrato de fianza. Nuestro Código Civil la define, en su Art. 1721, del modo siguiente: "Por la fianza se obliga uno a pagar o cumplir por un tercero, en el caso de no hacerlo éste." 31 L.P.R.A. sec. 4871. La citada definición comprende claramente las características distintivas de este contrato. Al comentar sobre el Art. 1.822 del Código español —del que proviene el nuestro— Castán las enumera y explica de la forma siguiente:

1. La accesoriedad de la obligación, ya que, como los demás contratos de garantía, el *de fianza no puede concebirse sino con-dicionado por la existencia de una obligación principal* (senten-cia de 25 de febrero de 1958). De aquí que sea necesario: pri-mero, que la obligación principal exista, y segundo, que sea válida.

2. La subsidiariedad, por virtud de la cual el fiador sólo se obliga para el caso en que el deudor principal no cumpla su obligación. Es consecuencia de esta nota de la fianza el benefi-cio de excusión del fiador.... (Énfasis en el original suprimido y énfasis suplido.) Castán Tobeñas, *op. cit.*, pág. 747.

■ La vida de la fianza, por lo tanto, *depende y está condicionada totalmente* a que exista una obligación principal. Inválida o desaparecida dicha obligación princi-pal, la obligación del fiador no puede subsistir. Consecuen-cia de tal carácter accesorio es que la fianza no puede tener objeto distinto ni más extenso que el de la obligación principal. El fiador puede obligarse a menos, pero no a más, que el obligado principalmente, tanto en la cantidad como en lo oneroso de las condiciones. Art. 1725 del Código Civil, 31 L.P.R.A. sec. 4875; *Comentarios del Código Civil*, Madrid, Ministerio de Justicia, Secretaría General Téc-nica, Centro de Publicaciones, 1991.

Debemos puntualizar, sin embargo, que las característi-cas mencionadas corresponden a la figura de la fianza sim-ple, ya que en el caso de la fianza solidaria, ésta se regirá por las disposiciones del Código Civil concernientes a las obligaciones de ese tipo. Véase Art. 1721 (31 L.P.R.A. sec. 4871).[2]

■ Es necesario, especialmente en las circunstancias

---

[2] No entraremos en la discusión de la obligación del fiador solidario en casos como el presente. Somos conscientes de que este Tribunal se expresó sobre el tema en el caso *García v. The Commonwealth Ins. Co.*, 118 D.P.R. 380 (1987), en el que se resolvió que la fianza judicial —de tipo solidaria— es una obligación accesoria que desaparece una vez lo hace la obligación principal. Tampoco entraremos a evaluar la corrección o no de dicho resultado. Nos expresaremos exclusivamente sobre la obli-gación del fiador en casos de fianza simple y sobre otros aspectos sobre los cuales debemos emitir nuestro juicio.

del presente caso, referirnos a los efectos que tiene sobre el contrato de fianza la figura de la transacción. Sobre este particular, el Art. 1734 de nuestro Código Civil establece:

La transacción hecha por el fiador con el acreedor no surte efecto para con el deudor principal.
*La hecha por éste tampoco surte efecto para el fiador, contra su voluntad.* (Énfasis suplido.) 31 L.P.R.A. sec. 4896.

La transacción es un contrato mediante el cual las partes, por medio de concesiones recíprocas, ponen término a un litigio ya comenzado o por comenzar. Los elementos esenciales de este contrato son: (*a*) una relación jurídica litigiosa, controvertida; (*b*) la intención de los contratantes de componer el litigio (eliminar la controversia), y (*c*) las recíprocas concesiones de las partes (*aliquid datum, aliquid retentum*). F.J. Peláez, *La Transacción: Su Eficacia Procesal*, Barcelona, Ed. Bosch, 1987, pág. 11. Existen distintas teorías sobre la naturaleza del contrato de transacción. Un gran sector de la doctrina apoya la naturaleza *declarativa* del contrato, por razón de que opinan que la transacción reconoce o declara que, de los derechos en controversia, tales pertenecen a una parte y tales a otra. Otro sector doctrinal apoya la naturaleza *traslativa* de dicho contrato, ya que sostienen que transmite a cada parte los derechos que se le adjudican. M. Albaladejo, *Curso de Derecho Civil Español*, 3ra ed., Barcelona, 1984, T. II, pág. 524; L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 4ta ed., Madrid, Ed. Tecnos, 1984, Vol. II. Los tratadistas suelen, además, clasificar la transacción como *pura* o *compleja*. La transacción pura será aquella que no atribuye derechos nuevos, sino que solamente produce el reconocimiento de derechos que ya pertenecían a las partes. La compleja, por otro lado, será aquella en que, además de los recíprocos reconocimientos de derechos, hay atribución de nuevos derechos. Ejemplo de esto es si una de las partes renuncia a su derecho en la cosa en contro-

versia, cediéndola a la otra, mediando una compensación pecuniaria. D. Espín Cánovas, *Manual de Derecho Civil Español*, 6ta ed., Madrid, Ed. Rev. Der. Privado, 1983, Vol. III. Véase, además, *García v. The Commonwealth Ins. Co.*, supra, pág. 389. En la medida en que por la transacción surja una obligación distinta a la preexistente o se extinga la misma, se extinguirá el derecho accesorio de fianza. Sobre el mencionado efecto, expresan Díez-Picazo y Gullón:

> Por regla general puede decirse que de la misma forma que una sentencia no afecta por principio a terceros que no han litigado, tampoco la transacción les es oponible ni puede perjudicar sus derechos. Los terceros pueden legítimamente considerar que mediante ella las partes han creado entre sí una nueva relación jurídica. Díez-Picazo y Gullón, *op. cit.*, pág. 522.

▮ De lo anteriormente expuesto surge necesariamente la conclusión de que, siendo la transacción entre acreedor y deudor de carácter compleja —creadora de nuevos derechos u obligaciones— resulta imposible que subsista la obligación accesoria de la fianza sin el consentimiento del fiador. Lo dicho es un resultado lógico, por cuanto, si desaparece la obligación que vincula al acreedor con el deudor, surge a la vida una obligación nueva a la que no estaba vinculado el fiador. Sólo podrá hacerse parte dicho fiador de la nueva relación obligatoria si presta su consentimiento *expresamente*. Tal es el carácter del consentimiento, pues la obligación que nace a la vida no tiene nada que ver con la fianza. Esta última se extinguió en el momento en que dejó de existir la obligación que la generaba. Se constituirá una nueva obligación bilateral o recíproca en virtud del consentimiento y voluntad de las partes.

▮ Por otra parte, las concesiones efectuadas como parte del contrato de transacción —en su modalidad compleja— pueden ser diversas y, dentro de ellas, cabe ubicar la figura de la *dación en pago*. Se define la *datio in solutum* como el acto por el cual el deudor realiza, a título de pago,

una prestación distinta a la que adeudaba al acreedor, consintiendo este último en recibirla en sustitución a la debida. L. Pascual Estevill, *El Pago*, Barcelona, Ed. Bosch, 1986, pág. 282. Son requisitos de la dación en pago: (1) una obligación preexistente que se quiere extinguir; (2) un acuerdo de voluntades entre acreedor y deudor en el sentido de considerar extinguida la antigua obligación a cambio de la nueva prestación, y (3) una prestación realizada con intención de efectuar un pago total y definitivo. J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1976, T. I, Vol. 2. Sobre la relación de esta figura con el contrato accesorio de fianza, nuestro Código Civil, en su Art. 1748, dispone:

> Si el acreedor acepta voluntariamente un inmueble u otros cualesquiera efectos en pago de la deuda, aunque después los pierda por evicción, *queda libre el fiador.* (Énfasis suplido.) 31 L.P.R.A. sec. 4953.

Una vez efectuada la dación en pago, inexistente ya la obligación del deudor hacia el acreedor, la obligación accesoria queda extinguida. "La ejecución de la nueva prestación convenida implica la extinción de la obligación preexistente .... Por extinguirse totalmente la obligación primitiva, desaparecen igualmente sus derechos accesorios. El Código, como ya hemos visto, dispone expresamente que se extingue la fianza aunque después el acreedor pierda por evicción la cosa recibida (art. 1.849)." Puig Brutau, *op. cit.*, pág. 357. Recientemente, este Tribunal expresó el efecto de la dación en pago sobre la obligación accesoria de la hipoteca. Sostuvimos lo siguiente:

> A pesar de los serios debates que ha suscitado esta figura, existe un virtual consenso de que su principal efecto consiste en la extinción de la obligación originaria y que, en consecuencia, también desaparecen totalmente sus derechos accesorios y garantías. *Trabal Morales v. Ruiz Rodríguez*, 125 D.P.R. 340, 346 (1990).

## II

■ Es innegable que nos enfrentamos, en este caso, al contrato de fianza simple. Nos sorprende la alegación de los demandantes recurridos y la conclusión del Tribunal de Instancia en el sentido de que la fianza suscrita entre Southern Transport y los codemandados recurrentes es de carácter solidaria. No existe en autos documento alguno en el que conste una expresión clara en ese sentido. Para que exista la solidaridad entre deudor y fiador es compulsorio que así se pacte *expresamente*. De lo contrario, es imposible que dicha solidaridad pueda ser presumida. Art. 1090 del Código Civil, 31 L.P.R.A. sec. 3101.

Tratándose de la figura de la fianza simple, son aplicables las disposiciones del Código Civil reguladoras de dicho contrato. De especial importancia en el caso de autos son las características principales de accesoriedad y subsidiariedad.

Con el fin de determinar si la obligación de Southern Transport hacia General Electric efectivamente se extinguió, debemos examinar los acuerdos tomados por dichas partes. Mencionamos anteriormente el hecho de que General Electric y el síndico nombrado por el Tribunal de Quiebras acordaron una transacción que fue aprobada por el Tribunal de Instancia. Reproduzcamos, en lo pertinente, la Cláusula Núm. 5 —citada anteriormente— de la estipulación, en la que se recogió dicha transacción con el fin de determinar si se extinguió o no la obligación:

A cambio del traspaso del título legal de esta propiedad mueble la parte aquí compareciente *renuncia con perjuicio la reclamación* que ha instado en el presente caso en contra de Southern Transport & Oil Distributing Corporation. (Énfasis suplido.) Petición de revisión, *supra,* págs. 19–20.

El lenguaje de dicha cláusula no deja lugar a dudas respecto a la intención del acreedor de liberar al deudor de la

obligación que existía entre ellos. Mediante la transacción efectuada —consistente en la entrega de los camiones sobre los que pesaba un embargo preventivo— el acreedor liberó al deudor de la obligación existente. La nueva prestación dio lugar a que el acreedor desistiera de su reclamación en contra del deudor original. En esta situación, de ordinario, la fianza pierde toda su eficacia jurídica pues deja de existir la obligación principal en garantía de la cual se constituyó la fianza accesoria, *a menos que el fiador haya manifestado su conformidad a la transacción.* Así se desprende del citado Art. 1734 de nuestro Código Civil, el cual, según hemos visto, dispone que la transacción hecha por el deudor principal con el acreedor "no surte efecto para el fiador, *contra su voluntad".* (Énfasis suplido.)

■ Precisamente eso fue lo que ocurrió en el presente caso. Los codemandados, al inducir a la parte demandante a otorgar el préstamo garantizado por la fianza, expresamente se obligaron a cumplir con "todas las *transacciones (settlements), componendas (compromises), arreglos (compositions)* ... hechas de buena fe entre cualquier acreedor primario o secundario (*any primary and secondary obligors*) y el deudor hipotecante". Al manifestar expresamente que tales *transacciones, componendas* y *arreglos* serían obligatorias para los garantizadores (*shall be binding upon the undersigned*), éstos prestaron su conformidad a la transacción habida en este caso autorizando de antemano a la acreedora demandante y al deudor fiado por ellos a entrar en transacciones, componendas y arreglos, obligándose a cumplir con los mismos sin más condiciones que la de la buena fe.

Es un principio fundamental de nuestro ordenamiento civil el de la autonomía en la contratación. Las partes contratantes pueden establecer los pactos, cláusulas y condiciones que estimen convenientes al llevar a cabo sus negocios, siempre que los mismos no sean contrarios a las leyes,

a la moral ni al orden público. Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372; *Castle Enterprises, Inc. v. Registrador*, 87 D.P.R. 775 (1963); *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149 (1976); *Tastee Freez v. Negdo. Seg. Empleo*, 108 D.P.R. 495 (1979). Los acuerdos tomados por la demandante y los codemandados en el contrato de fianza suscrito por ellos obligan absolutamente a ambas partes, toda vez que dichos pactos no contravienen en forma alguna a las leyes, a la moral ni al orden público.

Según surge de la Cláusula Núm. 6 de la estipulación transaccional entre la demandante y el síndico de Southern Transport, la primera se reservó el derecho de continuar su causa de acción en contra de los codemandados recurrentes por el balance de la deuda una vez deducida de la misma el producto neto de la venta de los camiones. La obligación de los codemandados de satisfacer el referido balance subsiste a pesar de la transacción entre acreedor y deudor original, por razón de que dicha transacción se efectuó con el consentimiento de los recurrentes.

Por los motivos expuestos anteriormente, *se confirmará la sentencia recurrida.*

Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri no intervinieron.