MANUEL A. CASIANO, JR. y OTROS, demandantes y recurrentes, *v.* BORINTEX MANUFACTURING CORPORATION y OTROS, demandados y recurridos.

*Número:* RE-87-506          *Resuelto:* 14 de abril de 1993

*Alfonso Miranda Cárdenas* y *Jorge A. Santini Padilla*, abogados de la parte demandante y recurrente; *A.J. Amadeo Murga*, abogado de la parte demandada y recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

"El gran problema de la justicia es el 'hecho', no el 'derecho'; en establecer lo que ha ocurrido, cómo ha ocurrido, está la terrible dificultad de la obra del juez." S. Sentís Melendo, *Libertad del juez en materia probatoria*, Rev. Ciencias Jurídicas y Sociales, Argentina, 1959, pág. 36.

I

El 25 de octubre de 1985, Manuel A. Casiano Jr., su esposa Nora Casiano y la sociedad legal de gananciales de ambos demandaron en cumplimiento de contrato y cobro de honorarios ($50,000) a Borintex Manufacturing Corporation (Borintex) y a Enrique Lifschitz, por asesoramiento prestado en la obtención de una garantía con la *Farmer's Home Administration* del Departamento de Agricultura federal para un préstamo ante el *Banco Gubernamental de Fomento* (Banco Gubernamental).

Los demandados negaron responsabilidad y alegaron que el contrato, de haber existido, era nulo por ser contrario al orden público. Previa vista en sus méritos, el Tribunal Superior, Sala de San Juan (Hon. Antonio L. Corretjer Piquer, Juez), concluyó la existencia de dos (2) obligaciones a tenor con el contrato y lo acordado verbalmente: una como asesor-consultor, y la otra, ejercer indebidamente su influencia personal para lograr la aprobación del préstamo

lo antes posible. Con vista a esa realidad, en cuanto a la primera obligación, determinó que la remuneración pactada era desproporcionada y valoró en cinco mil dólares (5,000) los servicios prestados. Anuló la segunda obligación por atentar contra el orden público.

No conforme, a solicitud del señor Casiano, Jr. *et al.*, revisamos.

## II

Lo que es "influencia indebida" es algo que no puede verse, oirse ni sentirse; más bien es conducta sutil e intangible. Por su naturaleza y dinámica, versa sobre hechos difíciles de demostrar judicialmente mediante prueba directa. Ciertamente es inimaginable que sea objeto de estipulación escrita o expresa en un contrato.

No obstante esa dificultad probatoria, la evidencia desfilada reveló contundentemente que el señor Casiano, Jr., en esencia, contrajo la obligación de utilizar su influencia personal para lograr prioritariamente la aprobación de una garantía prestataria del Gobierno federal para un préstamo ante el Banco Gubernamental, solicitado por los demandados *Borintex y Lifschitz*, a usarse en el desarrollo de una fábrica textil en Vega Baja. Así lo demuestran todas las circunstancias coetáneas y posteriores al otorgamiento del contrato.[1] Expongámoslas.

*Primero*, Borintex contrató los servicios del señor Casiano, Jr. el 25 de septiembre de 1982. A esa fecha, *ya aquélla había contratado desde junio 3 a Development and Financial Consulting Co. (Development), entidad de*

---

[1] El juzgador puede examinar todas las circunstancias concurrentes al otorgamiento de un contrato para determinar la intención de las partes. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 70 (1983); *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405, 417 (1978).

Este enfoque jurisprudencial tiene su génesis en el Art. 1234 del Código Civil, que dispone:

"Para juzgar la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato." 31 L.P.R.A. sec. 3472.

*consultoría, para que le aconsejara y preparara toda la do-*
*cumentación necesaria para el préstamo ante el Banco Gu-*
*bernamental y la garantía prestataria requerida por la*
*Farmer's Home Administration.* Segundo, los documentos
presentados oportunamente por *Development* al Banco Gu-
bernamental y a la Farmer's Home Administration natu-
ralmente contenían suficiente información relativa a los
*méritos* del proyecto objeto del préstamo, en términos del
impacto ambiental, proyecciones financieras y beneficios
por la creación de empleos directos. *Tercero,* el señor Ca-
siano, Jr. nunca coordinó esfuerzos con, o conoció a, la re-
presentante de *Development.* Es un dato no contradicho
que esta última entidad ni siquiera recibió sugerencias o
instrucciones sobre la preparación y tramitación de las
propuestas de parte de los representantes de Borintex a
quien el señor Casiano, Jr. supuestamente asesoró sobre
estos particulares. E.N.P., pág. 16. *Cuarto,* una compara-
ción de los términos del contrato entre *Borintex-Develop-*
*ment* con el contrato (carta) entre *Borintex-Casiano, Jr.* co-
rrobora documentalmente la apreciación fáctica y el
dictamen del ilustrado tribunal sentenciador. El contrato
*Borintex-Casiano, Jr.* guarda absoluto silencio y no especi-
fica en qué consistirían los servicios que él debía brindar;
sólo señala el objetivo. Por su parte, el contrato *Borintex–*
*Development* describe detalladamente los servicios a
rendir. Así, el contrato *Borintex-Casiano, Jr.* declara escue-
tamente que Borintex ha solicitado sus servicios como con-
sultor y él se compromete a utilizar "sus mejores esfuerzos"
para ayudarla a obtener la garantía prestataria en el
tiempo más corto posible. No hay nada más. En contraste,
el contrato entre *Borintex-Development* no se limita a indi-
car que esta última rendirá servicios de consultoría en co-
nexión con la obtención de la garantía prestataria, sino que
consigna disposiciones relativas a: (a) todos los documen-
tos que la firma consultora *habría* de preparar; (b) la infor-
mación necesaria para tal tarea, y (c) todos los servicios

que realizaría Development al dar seguimiento a la tramitación de la propuesta, incluso "que el factor tiempo e[ra] esencial". *Y quinto*, más allá de esta prueba documental, cualesquiera dudas al respecto quedan disipadas por la naturaleza de las gestiones realizadas por el señor Casiano, Jr. Su recomendación principal a los representantes de Borintex fue reunirse con la Sra. Julita Rivera de Vincentí, Directora de la Farmer's Home Administration en Puerto Rico. Su apreciación fue que dicha reunión redundaría en la pronta tramitación de la solicitud, pues se requería una recomendación favorable de dicha funcionaria para que la solicitud prosperara en Washington. E.N.P., pág. 11. El señor Casiano, Jr. concertó la cita y acompañó a los representantes de Borintex. Según atestó, luego de esa reunión llamó varias veces a la señora Rivera de Vincentí para "darle seguimiento al asunto". E.N.P., pág. 12. El señor Casiano, Jr. y la señora Rivera de Vincentí fueron compañeros de gabinete del Primer Ejecutivo en el cuatrienio comprendido entre 1968 y 1972. *Nunca le informó a ella que cobraría $50,000 por sus servicios, esto es, que sus honorarios dependían de que se aprobara rápidamente la garantía.* E.N.P., pág. 14.

Conforme su propio testimonio, el señor Casiano, Jr. fue Director Ejecutivo de la División de Emigración del Gobierno de Puerto Rico durante 1969. Se trasladó a Puerto Rico en 1970 para fungir como Administrador de la Oficina de Fomento hasta 1973. Para el 1979 había cesado en sus funciones como Director del Banco Gubernamental y de su Junta de Directores. E.N.P., pág. 2. La señora Rivera de Vincentí fue Secretaria del Trabajo de Puerto Rico durante el cuatrienio comprendido entre 1968 y 1972.

Además de mantenerse en contacto con la señora Rivera de Vincentí, se comunicó con el entonces Subsecretario de Agricultura en Washington, a quien conocía personalmente, para ver "qu[é] prioridad se podía dar y cómo verían el asunto". E.N.P., pág. 13. Realizó varias llamadas a

las distintas agencias concernidas. E.N.P., pág. 14. Finalmente, quedó evidenciado que independientemente de las gestiones del señor Casiano, Jr., *Development* preparó y sometió la documentación necesaria y que la aprobación del préstamo estaba sujeta al cumplimiento rutinario de todos los requisitos de las agencias concernidas, incluso la Farmer's Home Administration. E.N.P., págs. 17–18.

"La vida del derecho, la forman los hechos." Sentís Melendo, *op. cit.* Ante esta evidencia, no podemos ignorar que el señor Casiano, Jr. trató de asegurar un beneficio para sí —los honorarios pactados— representando o pretendiendo que se hallaba en posición de influir a los funcionarios federales concernidos.(2) No hay prueba que avale la tesis de que sus mejores esfuerzos fueron dirigidos a los *méritos* del asunto, los cuales ya estaban adecuadamente expuestos en los documentos preparados por *Development.*

## III

■ Estamos, pues, ante una obligación nula por ser contraria al orden público, definido éste como:

> ... el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. El concepto orden público recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. ... En gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero que aun sin esa expresa declaración legislativa, constituyen principios rectores de sabio gobierno nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin por el estilo de una sociedad. *Hernández v. Méndez & Assoc. Dev. Corp.,* 105 D.P.R. 149, 153 (1976).

Corresponde a los tribunales darle concreción en cada caso a lo que es un concepto difuso. De otra forma, la men-

---

(2) En el argot boricua estamos ante una "pala con paga".

ción del "orden público" del Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, sería redundante por estimarse sinónimo perfecto de "ley", como límite a la voluntad privada.

■ En este aspecto, nuestro ordenamiento tutela escrupulosamente la función pública y la eleva a la categoría de un bien jurídico fundamental. El Art. 213 del Código Penal, 33 L.P.R.A. sec. 4364, tipifica como delito la *influencia indebida* al prohibir "[la obtención o el tratar] de obtener de otra [persona] cualquier beneficio asegurando o pretendiendo que se halla en aptitud de influir en cualquier forma en la conducta de un funcionario o empleado público en lo que respecta al ejercicio de sus funciones ...".

■ En *Pueblo v. Luzón*, 113 D.P.R. 315 (1982), rechazamos la tesis de que el estatuto sólo penalizaba aquella influencia dirigida a lograr que el funcionario obre en forma ilegal. Explicamos así su dilatado ámbito de aplicación:

> El precepto es amplio. Intenta tutelar el descargo honesto, libre de intervención o fuerza moral extraña en el ánimo de todo servidor en su función pública. Su prohibición se extiende a cualquier persona. No se limita a funcionarios o empleados públicos. Tampoco exige que el autor del acto se beneficie en su propio patrimonio. Basta que obtenga o intente obtener cualquier beneficio, que puede ser pro un tercero. Adviértase que la definición estatutaria de *beneficio* abarca "[c]ualquier provecho, utilidad, ventaja, lucro, o ganancia, no estando limitado el término a una ganancia pecuniaria o material, *sino que denota cualquier forma de ventaja* ... El estatuto penaliza el tratar o lograr un beneficio por pretender ejercer una influencia —real o imaginaria— en cualquier forma en la conducta de un funcionario, en lo que respecta al ejercicio de sus funciones. (Énfasis en el original.) *Pueblo v. Luzón*, supra, pág. 320.

■ Aunque reconocemos que el citado artículo no es aplicable a aquella conducta que pretenda intervenir en el ánimo de un funcionario *federal*, ello no es óbice para nutrir el discernimiento judicial de los elementos del delito de "influencia indebida" como medida para anular el contrato entre el señor Casiano, Jr. y Borintex. Se trata de princi-

pios que se desbordan más allá del cauce penal, que es sólo uno de los medios para dar vigencia al postulado de buena política pública de que "nadie tiene derecho a un trato preferente y ventajoso basado en el dinero, la ventaja o la mejor relación personal". *In re Franco Soto*, 115 D.P.R. 740, 752 (1984).

No hacerlo, es olvidar que el "juez tiene el deber, dentro de los límites de su poder de innovación, de mantener una relación entre el Derecho y la Moral, entre los preceptos de la Ciencia Jurídica y los de la razón y recta conciencia". B. Cardozo, *La naturaleza de la función judicial* (traducción primera, edición inglesa de 1921), Buenos Aires, Eds. Arayú, 1955, pág. 107. A tono con esa admonición, rechazamos refrendar esa práctica. *Incumbe a la Asamblea Legislativa establecer las excepciones, si algunas, respecto al ejercicio remunerado de influencias sobre funcionarios gubernamentales.*

## IV

Como expusimos, el tribunal de instancia resolvió que el señor Casiano, Jr. contrajo con la demandada Borintex una obligación válida como asesor-consultor y valoró sus servicios en $5,000. Aunque esa determinación se fundamentó en invocar erróneamente la doctrina de la revisibilidad del contrato (*rebus sic stantibus*) —*Casera Foods, Inc. v. E.L.A.*, 108 D.P.R. 850 (1979)— los planteamientos de Borintex reflejan que el señor Casiano, Jr. prestó servicios legítimos (asesor-consultor) cuantificables razonablemente en esa suma, por lo cual es acreedor a la misma. A fin de cuentas, la revisión se da contra la sentencia y no contra sus fundamentos. *Zorniak Air Servs. v. Cessna Aircraft Co.*, 132 D.P.R. 170 (1992); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Sánchez v. Eastern Air Lines, Inc.*, 114 D.P.R. 691, 695 (1983). La prueba determina el

remedio y marca la ruta para el derecho aplicable en la difícil tarea de aproximarnos al ideal de la justicia.

La Juez Asociada Señora Naveira de Rodón emitió opinión disidente. El Juez Asociado Señor Fuster Berlingeri no intervino.

— O —

Opinión disidente emitida por la Juez Asociada Señora Naveira de Rodón.

El Sr. Manuel A. Casiano, su esposa, la Sra. Nora Casiano, y la sociedad de bienes gananciales compuesta por ambos presentaron una demanda ante el Tribunal Superior, Sala de San Juan, sobre incumplimiento de contrato y cobro de dinero contra Borintex Manufacturing Corporation[1] (en adelante Borintex) y Enrique Lifschitz. Alegaron que entre el codemandante Manuel Casiano y la parte demandada se suscribió un Contrato de Consultoría,[2] mediante el cual el codemandante recurrente proveería servicios profesionales con miras a ayudar a la parte demandada a obtener una garantía prestataria de la entidad gubernamental federal *Farmer's Home Administra-*

---

[1] El 14 de febrero de 1991 se nos informó que la codemandada Borintex Manufacturing Corporation se encontraba acogida a los procedimientos en la Corte de Quiebras federal, al amparo del Capítulo 7 de la Ley de Quiebras federal. Por lo tanto, el 15 de marzo de 1991 paralizamos los procedimientos en cuanto a dicha codemandada.

[2] La carta contrato dispone:

"You have sought my services as a consultant in connection with a loan guarantee you are seeking from the Farmers Home Administration of the U.S. Department of Agriculture.

"I agree to use my best efforts to assi[s]t you in effectuating the above transaction in as expeditious a time frame as possible.

"My fee for the above services will be $50,000 (fifty thousand dollars) payable within 10 days after you have received disbursement of the first loan proceeds from the financial institution disbursing under the Farmers Home Administration guarantee.

"It is understood that my fee is deemed earned only if Borintex Manufacturing Corp., receives the loan guarantee described above and any disbursements are made under this guarantee."

*tion* (FHA) del Departamento de Agricultura de Estados Unidos. Según la parte recurrente, la parte demandada le adeuda la suma de cincuenta mil dólares ($50,000), la cual fue pactada como pago por sus servicios de asesoría y consultoría. Borintex y Lifschitz contestaron la demanda, negando que la parte demandante rindiera "servicios que ameriten el pago de la suma de $50,000 o suma alguna". Adujeron entre las defensas afirmativas que "[e]l contrato de haber existido, [era] nulo por ser contrario a la política pública".

Luego de un juicio en los méritos, el foro de instancia dictó sentencia, declarando con lugar la demanda. Determinó "que como cuestión de hecho y de derecho el señor Casiano tenía dos obligaciones a tenor con el contrato, la primera obligación era como asesor y consultor, la segunda era utilizar su influencia como funcionario para conseguir la aprobación del préstamo lo antes posible". Concluyó, además, que éste "asesoró a la parte demandada en varias reuniones y le explicó a qué personas tenían que visitar y cómo tenían que presentar su solicitud y todos los pasos que se requerían para las aprobaciones". También concluyó que el señor Casiano "utilizó su prestigio y su influencia como funcionario público federal para lograr trato preferente ante los otros funcionarios federales".

Como cuestión de derecho, resolvió que "la parte del contrato que le imponía al señor Casiano usar su influencia para adelantar la aprobación del préstamo [era] nula por ser contraria a la política pública del Estado y a la sana administración que debe prevalecer en una sociedad". No obstante, concluyó que prevalecía como válida la parte del contrato sobre la consejería y asesoría que realizó el señor Casiano a favor de la parte demandada. Tomando en consideración esas conclusiones de hecho y de derecho, concedió como justa compensación al señor Casiano la suma de cinco mil dólares ($5,000) por los servicios prestados.

Inconforme con esta decisión, la parte demandante recurrió ante este Tribunal planteando la comisión de tres (3) errores:

1. Erró el Honorable Tribunal Superior de Puerto Rico al determinar que el demandante, señor Casiano, tenía dos obligaciones para con la parte demandada, tales como el servir de asesor y consultor y el utilizar influencias personales con los empleados o funcionarios públicos; todo ello contrario a la prueba que desfiló en el Tribunal en la vista en su fondo.

2. Erró el Tribunal Superior al no ordenar, mediante la Sentencia, al pago total de la suma acordada en el contrato a pesar de haber declarado válida la obligación en éste contraída.

3. Erró el Honorable Tribunal Superior, en la aplicación del derecho según fue aplicado, y al ejercer su función moderadora sin justa causa para ello, ignorando el mandato expreso de ley que tienen los Tribunales de Justicia de respetar y hacer cumplir los contratos privados.

Decidimos revisar y expedimos el auto.

## I

Para la correcta adjudicación del caso de autos debemos determinar si en el contrato en controversia había una obligación para utilizar indebidamente influencias personales para lograr un trato preferente en algún asunto ante la consideración del Gobierno.

De la exposición narrativa de la prueba y de los documentos presentados en evidencia surgen los siguientes datos que exponemos a continuación. Para la fecha en que se celebró la vista en su fondo el señor Casiano era dueño y presidente del Periódico Caribbean Business, la Revista Imagen y del Puerto Rico Business Digest. También era asesor del Comité Ejecutivo del Gobernador de Puerto Rico, consejero y asesor con respecto a la posición de Puerto Rico en el proyecto de la Cuenca del Caribe y miembro del Consejo Nacional del *Small Business Administration* en Washington. Anterior a esto, administró la Oficina

de Fomento Económico por aproximadamente tres (3) años, hasta que en 1973 se retiró de su cargo para incursionar en negocios propios. Entre éstos, creó una compañía para dar asesoramiento y obtener financiamiento para el desarrollo de industrias. Al momento de la vista en su fondo, estaba dedicado primordialmente al desarrollo del periódico y las revistas. Por último, también formó parte de la Junta de Directores del Banco Gubernamental de Fomento, cargo al cual dejó de pertenecer en 1979.

## II

En *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991), reiteramos la norma firmemente establecida de que la libertad de contratación no es irrestricta, ya que está atemperada por el Art. 1207 del Código Civil, 31 L.P.R.A. sec. 3372, el cual consagra el principio de la autonomía de la voluntad de los contratos y, a la vez, dispone que las partes contratantes "pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público".

Con respecto al significado de "orden público", hemos expresado:

"Orden público" es el conjunto de valores eminentes que guían la existencia y bienestar de una sociedad. El concepto orden público recoge y ampara un interés social dominante por su trascendencia, por el número de personas que afecta y por la valía de los derechos que tiende a proteger. *Wiley v. Livingston*, 376 U.S. 543, 549–50 (1964). En gran medida el orden público es acopio de normas de moral y de ética pública que en ocasiones alcanzan su exposición en ley, pero que aun sin esa expresa declaración legislativa, constituyen principios rectores de sabio gobierno nacidos de la civilización y fortalecidos por la cultura, la costumbre, por la manera de ser, en fin por el estilo de una sociedad. Castán ve tanto en la costumbre como en la ley el modo de manifestación de la voluntad social predominante. *Derecho Civil*, Tomo 1, Vol. 1ro, Décima Edición (1962), pág. 335. *Hernández v. Méndez & Assoc. Dev. Corp.*, 105 D.P.R. 149, 153 (1976).

Allí también expresamos que, según Manresa, al hablarse de contratos

"[e]l orden público ... representa el interés público, social y de ley en el Derecho privado, lo permanente y esencial de las instituciones, lo que aún favoreciendo a algún individuo en quien se concreta el derecho, no puede quedar a su arbitrio .... La evolución jurídica camina decididamente hacia una infiltración cada vez mayor de elementos éticos y sociales, de tono imperativo que de modo general en absoluto disciplinarán las relaciones de derecho privado, imprimiéndoles carácter público a expensas del principio de autonomía de la voluntad que, de esta suerte, va perdiendo volumen en su clásica y amplia esfera de acción. (S. 2 de abril de 1946.)" Manresa, *Comentarios al Código Civil Español*, Tomo 8, Vol. 2, Sexta Ed. (1967), págs. 381 y 383. *Hernández v. Méndez & Assoc. Dev. Corp.*, supra, págs. 153–154.

Como expresamos en *Unisys v. Ramallo Brothers*, supra, el orden público es parte de la política pública que permite y contribuye a una mejor convivencia social.

Con este trasfondo, pasemos a analizar si el uso de influencias personales para lograr un trato preferente en algún asunto ante la consideración del Gobierno es contrario al orden público. Nuestra posición en cuanto a esto es clara. Así lo establecimos en *In re Franco Soto*, 115 D.P.R. 740, 751–752 (1984), al expresar:

El pretender ejercer una influencia —expresa o sutil, real o imaginaria— sobre los órganos administrativos o judiciales adjudicativos y sus funcionarios, representa un interés apremiante debidamente tutelado por el Estado moderno.

La premisa es sencilla, pero de inconmensurable valor: en un régimen de leyes nadie tiene derecho a un trato preferente y ventajoso basado en el dinero, la ventaja o la mejor relación personal. Nuestra administración pública está cimentada en el fiel desempeño del ejercicio por los funcionarios públicos, sin que para ello medie paga adicional alguna o consideraciones extrañas a los méritos del asunto en cuestión.

Ahora bien, esto no significa que por el mero hecho de conocer personalmente a un funcionario, ya sea por una relación social o profesional, se deba pensar que una per-

sona se está tratanto de aprovechar o ejercer una influencia indebida sobre aquel que tiene el poder decisional. Es una inescapable realidad que el mundo de hoy se torna cada vez más complejo y que el trámite ante la burocracia gubernamental puede ser a veces un largo, angustioso y complicado proceso para obtener ya sean servicios, contratos o permisos del Estado para llevar a cabo diversas actividades. Aquellas personas que han pasado por esta experiencia conocen los trámites a seguir, las personas a quienes se deben dirigir, los requisitos que se exigen y las circunstancias que podrían influir de manera favorable en la determinación del Estado sobre algún asunto pendiente. El uso de todos estos conocimientos, además de la experiencia y "pericia" que pueda haber adquirido una persona sobre cómo conducir y tramitar ciertos asuntos ante funcionarios del Estado, no se traduce a considerar que sus gestiones están permeadas o teñidas de influencias indebidas. Es indudable que este tipo de persona, de por sí, está en una situación más ventajosa que otro que desconozca los procedimientos y las personas a las cuales dirigirse. Cuando la solicitud de algún servicio, contrato o permiso cumple con los requisitos de ley, ninguna consideración extraña a los méritos del asunto en cuestión debe ser determinante para obtenerse.

Según el *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, pág. 822, "influencia" es el poder o autoridad de una persona para con otra u otras, o para intervenir en un negocio. El verbo "influir" se define, entre otros, como contribuir con más o menos eficacia al éxito de un negocio. Ciertamente, no hay nada inmoral en tratar de ejercer influencia para lograr el éxito en cualquier tipo de gestión ante el Gobierno. La influencia a que se refiere el caso *In re Franco Soto*, supra, es aquella indebida. Ésta se ha definido como "[i]nfluencia ejercida sobre una persona a fin de intervenir con su libre voluntad". I. Rivera García, *Diccionario de Términos Jurí-*

*dicos*, 2da ed. rev., New Hampshire, Equity Publishing Co., 1976, pág. 133. Esta definición se da dentro del contexto del derecho de contratos, en específico con relación a la figura del dolo. *Rivera v. Sucn. Díaz Luzunaris*, 70 D.P.R. 181 (1949). Aún así, podemos aplicarla a la situación del caso de autos, ya que partimos de la premisa que de no ser por la influencia indebida, el funcionario no hubiese actuado a favor de aquel que la ejerció. Si el actor no trata de intervenir con la libre voluntad del funcionario, no se da la influencia indebida. Si la influencia es un elemento adicional ajeno a los méritos del caso, hay influencia indebida.

Por otro lado, "[t]oda persona que obtuviere o tratare de obtener de otra cualquier beneficio asegurando o pretendiendo que se halla en aptitud de influir en cualquier forma en la conducta de un funcionario o empleado público en lo que respecta al ejercicio de sus funciones", está cometiendo el delito de influencia indebida según tipificado en el Art. 213 del Código Penal, 33 L.P.R.A. sec. 4364. En *Pueblo v. Luzón*, 113 D.P.R. 315, 320 (1982), al interpretar este delito expresamos:

> El precepto es amplio. Intenta tutelar el descargo honesto, libre de intervención o fuerza moral extraña *en el ánimo de todo servidor en su función pública*. Su prohibición se extiende a cualquier persona. No se limita a funcionarios o empleados públicos. Tampoco exige que el autor del acto se beneficie en su propio patrimonio. Basta que obtenga o intente obtener cualquier beneficio, que puede ser pro un tercero. Adviértase que la definición estatutaria de beneficio abarca "[c]ualquier provecho, utilidad, ventaja, lucro, o ganancia, no estando limitado el término a una ganancia pecuniaria o material, sino que denota cualquier forma de ventaja". Art. 7(6), 33 L.P.R.A. sec. 3022(6). ... El estatuto penaliza el *tratar o lograr un beneficio por pretender ejercer una influencia* —real o imaginaria— en cualquier forma en la conducta de un funcionario, en lo que respecta al ejercicio de sus funciones. (Énfasis en el original suprimido y énfasis suplido.)

Según la Prof. Dora Nevares-Muñiz, "[e]l delito se consuma tan pronto la persona obtiene de otra el beneficio de la influencia indebida. El tipo incluye, además, la tentativa

en tanto utiliza el verbo 'tratare de obtener'. En ese caso el delito se consuma tan pronto lleve a cabo actos afirmativos dirigidos a obtener de otra persona un beneficio bajo el pretexto de ser capaz de influir en la gestión pública". D. Nevares-Muñiz, *Código Penal de Puerto Rico: revisado y comentado*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 365. Es importante aclarar que al expresar el delito "funcionario o empleado público" se refiere a

> ... toda persona que ejerza un cargo o desempeñe una función retribuida o gratuita, permanente o temporal, en virtud de cualquier tipo de nombramiento, contrato o designación, para la rama legislativa, ejecutiva o judicial del Estado Libre Asociado de Puerto Rico, o en cualquiera de sus municipios, agencias o corporaciones públicas, subdivisiones políticas y demás dependencias públicas. 33 L.P.R.A. sec. 3022.

El propósito que se persigue mediante esta disposición es tener un Gobierno libre de funcionarios faltos de ética y escrúpulos que puedan ser influidos y manipulados por fuerzas externas ajenas a los méritos de los casos ante su consideración. En estos tiempos en que la corrupción parece haber invadido las esferas gubernamentales como una enfermedad sin cura, tenemos el deber de velar por que la confianza del Pueblo no se siga minando. El problema más bien es cómo regular, controlar y fiscalizar la conducta de los funcionarios más que cómo regular la conducta de aquellos que quieren influir a los funcionarios ya que, teniendo control sobre las actuaciones de éstos, habrá menos probabilidad de que se dejen influir.

Como parte del andamiaje gubernamental para evitar el efecto nocivo del uso indebido de influencias con relación a los funcionarios públicos está " '[e]l Art. 212 [del Código Penal sobre oferta de soborno que] condena cierta conducta antisocial e indeseable, la cual corrompe o pretende corromper al *funcionario público*, quien debe descargar gratuitamente las obligaciones inherentes de su cargo sin que esté de por medio emolumento o cualquier beneficio adicional al que por ley le corresponde' ". (Énfasis suplido.) *Pue-*

*blo v. Carballosa y Balzac*, 130 D.P.R. 842 (1992), citando a *Pueblo v. Bigio Pastrana*, 116 D.P.R. 748, 756–757 (1985). En este último, también expresamos:

Irreparable daño social se infligiría si el cumplimiento de los oficios del empleado público dependiese de las retribuciones impropias que elementos inescrupulosos están dispuestos a ofrecer y entregar; es el comportamiento de estos últimos el que se pretende reprimir al estatuir el delito de oferta de soborno. La gestión pública ha de realizarse sin que medie dinero o cualquier tipo de beneficio. Éstos son totalmente extraños a la sana administración pública y al efectivo funcionamiento de nuestro sistema, el cual debe ser guiado por la justicia, la ley y el orden. *Pueblo v. Bigio Pastrana*, supra, pág. 757.

En 1985 se aprobó la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, Ley Núm. 12 de 24 de julio de 1985 (3 L.P.R.A. sec. 1801 *et seq.*). Esta ley se creó para promover y preservar la integridad de los funcionarios e instituciones públicas del Gobierno del Estado Libre Asociado de Puerto Rico, y expresa en su Exposición de Motivos que éste,

... como cuerpo político, está comprometido con una responsabilidad moral y con una responsabilidad ética en el sentido de obrar de acuerdo a unas normas y principios que rigen la conducta del buen vivir de su gente. Esa responsabilidad ética obliga a un continuo examen del comportamiento social y público de sus ciudadanos.

En todo momento, tiene el Estado que garantizar el respeto al derecho y la obediencia a la ley. Esta misión le es fundamental especialmente cuando se trata de la conducta de aquellos funcionarios públicos que lo representan como servidores.

Hay ocasiones en que, por desventura, surgen unas acciones improcedentes por parte de algunos funcionarios que, al incurrir en claras faltas a las normas de ética, ponen en riesgo la estabilidad del soporte moral del estado. Es intolerable que existan funcionarios públicos en representación de la administración del Gobierno que puedan lucrarse del patrimonio del pueblo. Los conflictos de intereses, especialmente financieros, en abierta violación a las leyes son también intolerables.

Para restaurar la confianza del pueblo en su Gobierno y en sus funcionarios públicos, cuando muchos de ellos han rebasado el nivel de lo tolerable, es preciso adoptar nuevas medidas le-

gislativas que sean eficaces para prevenir y para penalizar el comportamiento delictivo de aquellos funcionarios que, en el desempeño de sus labores gubernamentales, vulneren los principios básicos de una ética de excelencia. Exposición de Motivos de la Ley Núm. 12, *supra*, 1985 Leyes de Puerto Rico 708, 709.

El Secretario de Justicia, al comparecer a la Asamblea Legislativa en apoyo al proyecto que posteriormente se convirtió en la susodicha ley, expresó:

En los últimos años, ciertamente, han surgido a la luz pública un sinnúmero de casos caracterizados por su alto contenido de corrupción. La incidencia de la conducta corrupta en la administración gubernamental resulta alarmante. La *venta de influencias*, el fraude, los conflictos de intereses y la conducta impropia e ilegal de muchos funcionarios públicos ha constituido el tema que en los últimos años ha indignado el espíritu de nuestro Pueblo y ha minado su credibilidad en las instituciones de gobierno. (Énfasis suplido.) Informe Conjunto al Senado de las Comisiones de Asuntos del Ciudadano y Etica Gubernamental, de lo Jurídico, de Gobierno Estatal y de Hacienda de Mayo de 1985, pág. 2.

En el debate ante el Senado de Puerto Rico, el Senador Izquierdo Stella expresó que el pueblo "ha perdido la fe en las instituciones, porque ha habido mucha deshonestidad, corrupción, falsificación de documentos, utilización indebida de fondos públicos. Y este Proyecto va dirigido a establecer unas normas claras para el comportamiento de los funcionarios públicos. Van a estar vigilados por el Pueblo que espera el comportamiento más honesto, el comportamiento de ese funcionario que su mayor riqueza tiene que ser la oportunidad que le dan de servirle bien al Pueblo de Puerto Rico". Diario de Sesiones de 29 de mayo de 1985, pág. 4828.

Según el Informe Conjunto al Senado antes citado, esta legislación recoge parte del esquema de la legislación federal y de las jurisdicciones estatales relacionadas con la ética gubernamental. Así se incorporó en ella un código de ética para los funcionarios y empleados de la Rama Ejecutiva, se establecieron restricciones para las actuaciones de

ex servidores públicos y disposiciones relativas a los funcionarios y empleados de la Rama Judicial y de la Rama Legislativa.(³) Entre otras importantes prohibiciones contenidas en esta ley están las de 3 L.P.R.A. sec. 1823. Toda la política gubernamental va encaminada a tratar de evitar que circunstancias ajenas a los méritos de los asuntos ante la consideración del Gobierno influyan en la decisión del funcionario. Se trata de evitar hasta la apariencia de conflicto de intereses, favoritismo y de posibles influencias indebidas.(⁴)

En el ámbito federal se ha resuelto que un contrato en el cual una oficial gubernamental se compromete con una persona a usar sus influencias para lograr obtener un contrato con otro oficial del Gobierno a cambio de una compensación monetaria, es contrario a la moral y al orden públicos. *Oscanyan v. Arms Co.*, 103 U.S. 261 (1880). El Tribunal Supremo federal indicó en dicho caso que el uso

---

(³) Entre las prohibiciones éticas de carácter general más pertinentes se encuentran aquellas contenidas en la Sec. 1822(c), (d) y (e):

"Ningún funcionario o empleado público utilizará los deberes y facultades de su cargo ni la propiedad o fondos públicos para obtener, directa o indirectamente para él, para algún miembro de su unidad familiar, ni para cualquier otra persona, negocio o entidad, ventajas, beneficios o privilegios que no estén permitidos por ley." 3 L.P.R.A. sec. 1822(c).

"Ningún funcionario o empleado público solicitará ni aceptará bien alguno de valor económico como pago por realizar los deberes y responsabilidades de su empleo aparte del sueldo, jornal o compensación a que tiene derecho por su función o empleo público." 3 L.P.R.A. sec. 1822(d).

"Ningún funcionario o empleado público aceptará o solicitará de persona alguna, directa o indirectamente, para él, para algún miembro de su unidad familiar, ni para cualquier otra persona, negocio o entidad, bien alguno de valor económico, incluyendo regalos, préstamos, promesas, favores o servicios a cambio de que la actuación de dicho funcionario o empleado público esté *influenciada a favor de esa o cualquier otra persona*." (Énfasis suplido.) 3 L.P.R.A. sec. 1822(e).

(⁴) Es importante señalar que los cánones de ética judicial y el Código de Ética Profesional también contienen cánones específicos sobre "influencia indebida". 4 L.P.R.A. Ap. IV-A y Ap. IX. Los cánones aplicables a los jueces establecen una sección completa titulada *De las influencias indebidas*, donde, por ejemplo, se expresa que el Juez no debe usar su poder o prestigio para su beneficio personal. Por otro lado, el Canon 11 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, expresa, *inter alia*, que el abogado debe tener sumo cuidado en abstenerse de tratar de ejercer una influencia o presión indebida en la tramitación de cualquier asunto sometido ante la consideración judicial. Véase también el Canon 36 sobre publicidad o anuncios del abogado y el Canon 6 sobre la conducta ante agencias gubernamentales, 4 L.P.R.A. Ap. IX.

de la influencia fue la causa del contrato. El demandado, una corporación americana, acordó pagarle al demandante, Cónsul General del Gobierno Otomano, por el uso de sus influencias para lograr venderle armas a un representante del Gobierno de Turquía. Como aclaración histórica, recordemos que para 1880 Turquía era también conocido como el Imperio Otomano.

De manera tajante, el Tribunal Supremo federal expresó que ese tipo de contrato es corrupto en su origen; que los servicios estipulados y prestados estaban prohibidos por consideraciones de moral y política públicas que deben prevalecer en todo momento y en todos los países, y sin los cuales la fidelidad a la confianza pública sería como un negocio o venta y no un deber. El Tribunal consideró que como Oscanyan, el demandante era un representante de su Gobierno y que estaba impedido de asumir posición alguna en conflicto con los intereses y la política de su Gobierno. Añadió que cuando otras consideraciones intervienen en el ejercicio de su deber, la confianza en la comunidad sufre. En este caso lo que motivó a Oscanyan fue la posibilidad de ganar dinero por la venta de las armas. Expresa el Tribunal que la influencia personal ejercitable sobre un oficial del Gobierno en la obtención de un contrato no es un artículo vendible en nuestro sistema de leyes y moral. Citando otro caso, manifiesta que cualquier cosa que tienda a introducir otros elementos en las acciones del Gobierno está en contra de la política pública. El único factor que debe considerarse es de qué modo más eficiente y económico se logra el bienestar de la comunidad.

Lo más importante que establece este caso es que hay que distinguir entre el ofrecimiento de servicios profesionales *versus* solicitud personal. Los contratos por servicios profesionales son totalmente legítimos e incluyen, por ejemplo, proveerle toda la información necesaria al funcionario para que éste tome la decisión que mejor sirva a los intereses de la comunidad.

Sin embargo, no son válidos los contratos que involucran aquellas situaciones en que en vez de darle a los funcionarios del Gobierno la información que debe guiar propiamente su juicio, la influencia personal es el medio para asegurar una acción. En otras palabras, hay venta de influencia a cambio de una remuneración. Véase, también, *Valdes v. Larrinaga*, 233 U.S. 705 (1914). Allí el Tribunal Supremo federal, en un caso originado en el Tribunal de Distrito Federal para el Distrito de Puerto Rico, resolvió que no es contrario a la política pública que un ex funcionario del Gobierno pacte honorarios por servicios profesionales para ayudar a una persona en todos los pasos, planes y cuestiones técnicas para lograr obtener una franquicia del Gobierno. En dicho caso, el tribunal examinó las cartas que intercambiaron las partes y concluyó que no surge de éstas lenguaje que implique conducta impropia.

Este caso refleja el desarrollo de la doctrina esbozada en *Tool Company v. Norris*, 69 U.S. 45 (1864), de que pactar honorarios contingentes si se logra éxito en un asunto ante el Gobierno es contrario a la política pública. La regla federal actual establece que, en ausencia de ley o reglamentación, los tribunales rechazarán obligar a cumplir un contrato por honorarios contingentes sólo cuando un esfuerzo por introducir influencia personal indebida se intenta u ocurre de hecho. *Racquet Club, Inc. v. Lipper*, 373 F.2d 753 (1er Cir. 1967). Allí también se indica que los tribunales han reconocido que el Gobierno puede declarar que son contrarios a la política pública ciertos honorarios pagados en conexión con unas categorías de contratos definidos. Por eso han determinado que una declaración de tal naturaleza derrota el esfuerzo de una parte por recobrar honorarios. *Racquet Club, Inc. v. Lipper*, supra, pág. 754. Algunos tribunales han determinado que es legítimo que una persona que no es un funcionario o empleado del Gobierno pueda acordar en un contrato usar su influencia o sus conexiones personales meramente para ganar acceso a

un oficial público o hasta para instar a dicho oficial a favorecer la propuesta de su cliente, *siempre y cuando la persuasión se haga sobre los méritos de la propuesta y no sobre otro fundamento. Industries, Investments, Etc. v. Panelfab Intern.*, 529 F.2d 1203 (5to Cir.1976), y casos allí citados. En este caso, contrario a *Oscanyan v. Arms Co.*, supra, no se trataba de un oficial gubernamental que acordó usar su posición oficial para influir a otro oficial de su mismo Gobierno. Este tipo de acuerdo es ilegal y contrario a la política pública.

El a veces complicado camino que hay que recorrer cuando se trata de obtener algún servicio o contrato del Gobierno ha hecho necesario que se legisle al respecto.(⁵) Aquellas personas que ofrecen sus servicios profesionales para recorrer este camino lo hacen válidamente. Aquellas personas que quieren atajar el camino por medios inescrupulosos al tratar de ejercer influencia indebida sobre los funcionarios no tienen cabida en nuestro sistema democrático. No podemos permitir que esto ocurra bajo circunstancia alguna.

Para probar que una persona ejerció o trató de ejercer influencia indebida, se deben traer hechos que convenzan al juzgador que la persona se trató de aprovechar de su posición o relación con el funcionario para intervenir con su libre voluntad con el propósito de obtener un trato preferente o ventajoso, o que expresa o implícitamente aseguró o aparentó que se hallaba en posición de influir en cualquier forma al funcionario en lo que respecta al des-

---

(⁵) No podemos perder de vista que varios de estos casos fueron resueltos hace muchos años y que actualmente el Gobierno federal ha aprobado leyes que tratan esta cuestión específicamente, entre las cuales se destacan las siguientes: 5 U.S.C. Ap. 4, sec. 401 *et seq.*, la cual establece restricciones a ex empleados de las Ramas Ejecutiva y Legislativa; 41 U.S.C. sec. 251 *et seq.* y sec. 423, sobre procedimientos para obtener contratos de servicios y propiedades con el Gobierno federal; 31 U.S.C. sec. 1352, sobre la limitación del uso de ciertos fondos federales para influir en ciertas transacciones con el Gobierno federal. Esta última ley de reciente aprobación está ampliamente discutida en el artículo de T.M. Susman y C.S. Marsh, *Byrd Shot: Congress Takes a Broad Aim at Government Contract Lobbyists*, 37 Federal Bar News & Journal 387 (1990).

cargo de sus funciones. Esto, claro está, no impide ni hace ilegal que una persona trate de convencer a un funcionario e influir en su decisión a base de los méritos de la propuesta. Naturalmente, el hecho de si ha habido el uso de influencia indebida se determinará caso a caso, ya que las situaciones en que se puede dar son muy diversas, lo que nos impide establecer una regla limitada e inflexible.

En el caso de autos, los hechos no demuestran que hubo influencia indebida. Veamos por qué.

## III

En la carta contrato que suscribieron ambas partes, el señor Casiano se obligó y el señor Lifschitz aceptó, en su capacidad personal y como presidente de Borintex, que por la suma de cincuenta mil dólares ($50,000) aquél le ofrecería servicios profesionales de consultoría para tratar de obtener una garantía prestataria del FHA y que se esforzaría por lograr esto en el tiempo más breve posible.

Surge de la Exposición Narrativa de la Prueba que las partes celebraron varias reuniones. Inicialmente, en éstas, el señor Lifschitz le informó al señor Casiano del proyecto que se proponía a desarrollar, los trámites que se habían hecho y la necesidad de obtener la garantía prestataria para poder lograr la aprobación de un préstamo del Banco Gubernamental de Fomento y así establecer un negocio. Una preocupación de la parte demandada era el tiempo que podría demorar la aprobación de la garantía prestataria. El señor Casiano asesoró al señor Lifschitz en cuanto a la forma y manera en que se debían hacer las presentaciones a los funcionarios del Gobierno, cómo se debían preparar las propuestas, cómo enfatizar las áreas a las cuales se acostumbra dar énfasis para conceder o no finalmente lo solicitado. Otra gestión que hizo el señor Casiano fue concertar y asistir a una cita con la directora de la FHA en Puerto Rico para presentarle los pormenores de

proyecto. Esta presentación la hizo el socio del demandado. Posterior a esta reunión, Casiano le dio seguimiento a estas gestiones mediante vía telefónica. También se comunicó telefónicamente con un funcionario federal en Washington, que estaba encargado de los proyectos relacionados a la solicitud de los demandados, para ver qué prioridad se podía dar y cómo verían el caso. Admitió Casiano que lo conocía, pero que no era amigo de él. De esta comunicación se concertó una reunión y la directora de la FHA le hizo una presentación a dicho funcionario para exponerle la viabilidad del proyecto.

En síntesis, estas fueron las gestiones que hizo el señor Casiano, las cuales tuvieron como resultado el que se obtuviese, en un lapso de tiempo relativamente corto, la garantía prestataria. De esto, el contrato, las reuniones y las gestiones realizadas por el señor Casiano, el tribunal de instancia concluyó que éste tenía dos (2) obligaciones: la primera era como asesor y consultor, y la segunda era utilizar su influencia personal como funcionario para conseguir la aprobación del préstamo lo antes posible. También determinó que utilizó su prestigio y su influencia ante los otros funcionarios federales. No podemos estar de acuerdo.

Luego de evaluar la prueba documental y examinar las gestiones que hizo el señor Casiano, según surgen de la Exposición Narrativa de la Prueba, contrario a la mayoría de este Tribunal, no albergamos la menor duda de que él no contrató para ejercer ni trató de ejercer *influencia indebida*. Indudablemente, por su experiencia estaba en mejor posición que otros para conseguir la garantía prestataria, ya que estaba familiarizado con los trámites a seguir, las personas ante las cuales presentar los proyectos y la manera más beneficiosa de hacerlo. Ni del contrato ni de las gestiones que realizó surge que incurriera en algún tipo de práctica impropia. No se desprende de los hechos que su propósito fuera intervenir indebidamente con la libre voluntad de los funcionarios gubernamentales. Su objetivo

fue, más bien, hacer viable, facilitar, agilizar y simplificar los trámites para lograr el éxito de la gestión que le fue encomendada. Los hechos tampoco demuestran que expresa o implícitamente aseguró o pretendió hacer creer que se hallaba en posición de influir en cualquier forma al funcionario en lo que respecta al ejercicio de sus funciones. Como dijéramos anteriormente, el mero hecho de conocer a las personas que tienen el poder decisional en el Gobierno no convierten sus gestiones, automáticamente, en impropias o indebidas. En este caso, la parte demandada no probó su defensa afirmativa de que pactó para utilizar influencia indebida. Tampoco demostró con hechos de qué forma fue indebida la intervención del señor Casiano en la consecución de la garantía prestataria.

## IV

Por todo lo anteriormente expuesto, entendemos que el contrato de servicios profesionales objeto de esta controversia es válido. Habiéndose pactado los honorarios libre y voluntariamente por personas versadas en los negocios, éstos son exigibles y no vemos razón alguna para reducir la cantidad acordada. *Ramírez, Segal & Látimer v. Rojo Rigual*, 123 D.P.R. 161 (1989). Tampoco existe "la excesiva onerosidad que alcance dimensiones de mala fe, que niegue aquellas normas de conducta colectiva que han de ser observadas por toda conciencia honrada y leal, connaturales a la contratación ...". *López de Victoria v. Rodríguez*, 113 D.P.R. 265, 270 (1982).

Por todo lo antes expuesto, disentimos de la opinión que hoy emite la mayoría. Entendemos que lo que procede es modificar la sentencia dictada por el foro de instancia para que se ordene el pago al demandante, Manuel A. Casiano, Jr., la totalidad de los honorarios pactados en el contrato de servicio, esto es, cincuenta mil dólares ($50,000).