DIRECTOR DE LA OFICINA DE ÉTICA GUBERNAMENTAL, demandante y recurrido, *v.* LUCAS MALAVÉ, demandado y peticionario.

*Número:* CE-94-232          *Resuelto:* 3 de junio de 1994

*Mario A. Rodríguez Torres,* abogado del peticionario.

## RESOLUCIÓN

A la petición de *certiorari* radicada por la parte demandada, *no ha lugar.*

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió un voto concurrente.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Voto concurrente del Juez Asociado Señor Negrón García.

"Hay ocasiones en que, por desventura, surgen unas acciones improcedentes por parte de algunos funcionarios que, al incurrir en claras faltas a las normas de ética, ponen en riesgo la estabilidad del soporte moral del Estado. Es intolerable que existan funcionarios públicos en representación de la administración del Gobierno que puedan lucrarse del patrimonio del pueblo. Los conflictos de intereses, especialmente financieros, en abierta violación a las leyes son también intolerables." Exposición de Motivos de la Ley Núm. 12 de 24 de Julio de 1985, Leyes de Puerto

Rico 709 (Ley de Ética Gubernamental, 3 L.P.R.A. sec. 1823(e)).

## I

Previa investigación iniciada *sua sponte*, el 12 de junio de 1991 el Director de la Oficina de Ética Gubernamental formuló una querella contra el Sr. Lucas Malavé que consistía en diez (10) cargos por violar el Art. 3.3(e) de la Ley de Ética Gubernamental, 3 L.P.R.A. sec. 1823(e).

En esencia, adujo que la firma social *García, Malavé & Landa* realizó nueve (9) contratos de auditoría y contabilidad con diversas agencias del Gobierno, sin la debida dispensa y autorización del Gobernador, aun cuando el señor Malavé era miembro de la Junta de Gobierno de la Autoridad de Teléfonos de Puerto Rico. También le imputó haber otorgado un contrato de compraventa, mediante el cual adquirió de la corporación pública *Compañía de Desarrollo Corporativo* el Centro Comercial Hnas. Dávila en Bayamón. Los primeros nueve (9) contratos produjeron a la firma social ingresos por cuatrocientos veintidós mil doscientos sesenta dólares ($422,260) y el precio de la compraventa fue de un millón quinientos veinticinco mil dólares ($1,525,000).

Actuó correctamente el Tribunal Superior, Sala de San Juan (Hon. Hiram A. Sánchez Martínez, Juez de Apelaciones) al avalar el dictamen de la Oficina de Ética Gubernamental que investigó y subsiguientemente multó en cuarenta y cinco mil dólares ($45,000) al peticionario señor Malavé.

## II

A la fecha de los hechos, el Art. 3.3(e) de la Ley de Ética Gubernamental, *supra*, disponía:([1])

> Ningún funcionario o empleado público podrá ser parte o tener algún interés en las ganancias o beneficios producto de un contrato con cualquiera otra agencia ejecutiva o dependencia gubernamental a menos que el Gobernador, previa recomendación del Secretario de Hacienda y del Secretario de Justicia, expresamente lo autorice. Sólo podrá llevarse a cabo la contratación en el caso previsto en este inciso sin solicitar y obtener la autorización del Gobernador cuando el contrato no sea por un valor mayor de $3,000.00 y no ocurra más de una vez durante cualquier año fiscal.

Su propósito es "evitar que un funcionario o empleado público entre en una relación contractual con cualquier otra agencia ejecutiva en circunstancias en que puedan surgir conflictos de intereses entre los que se encuentran la utilización de *influencia indebida* en la obtención del contrato". (Énfasis suplido.) Exposición de Motivos, *supra*.

Y como dijimos recientemente, "[l]o que es 'influencia indebida' es algo que no puede verse, oirse ni sentirse; más bien es conducta sutil e intangible".([2]) *Casiano, Jr. v. Borintex Mfg. Corp.*, 133 D.P.R. 127, 129 (1993).

---

([1]) Enmendado por la Ley Núm. 3 de 5 de abril de 1991 (3 L.P.R.A. sec. 1823(e)), para eximir de estas autorizaciones los contratos de ciertos servicios que diversas agencias públicas brindan a empleados del Gobierno. El nuevo texto de la ley no favorece al peticionario señor Malavé.

([2]) Para jueces y abogados el principio no es enteramente extraño. Los Cánones XI y XXIII del Código de Ética Judicial, 4 L.P.R.A. Ap. IV-A, y el Canon 11 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, prohíben el uso de influencias indebidas producto del poder y prestigio que generan sus funciones.

Aun así, la experiencia refleja instancias aisladas en que, vía actos sociales y de recreo, atentan lastimosamente contra el principio.

Sumo cuidado y prudencia ha de tener el juez al aceptar este tipo de invitaciones, para evitar ser sorprendido en su *buena fe*. "Los jueces son parte de la comunidad en que viven y por la posición que en ésta ocupan son llamados ocasionalmente

En el caso de autos, no erró el ilustrado tribunal sentenciador al determinar que

Sería virtualmente imposible que el Director Ejecutivo de la Oficina de Ética Gubernamental pudiera cumplir cabalmente con el propósito legislativo y la política pública encarnada en dicho estatuto si no le reconociéramos la facultad de investigar

a prestar su concurso en actividades de interés general, sean éstas de origen privado o estén auspiciadas por funcionarios públicos. Esa cooperación, sin embargo, tiene que darse dentro del marco de la Constitución, la ley y los Cánones de Ética Judicial y en armonía con la dignidad y las funciones de los tribunales. Tales limitaciones imponen a los jueces la obligación de cerciorarse, por todos los medios dignos asequibles, de los propósitos y circunstancias de los actos a los cuales se les invita y de abstenerse de asistir a aquéllos que por su carácter le están vedados o que razonablemente puedan dar lugar a la impresión de que se están transgrediendo esos límites. Esta es la única manera en que puede la judicatura mantener incólume su absoluta independencia." *In re Participación Jueces*, 80 D.P.R. 784, 786–787 (1958).

No podemos ser ingenuos. Mediante esas actividades se explota la situación y se proyecta, entonces, la impresión real o imaginaria de influencia del bufete, dando margen a la conclusión de Parry de que es "verdad que los estudios de los dirigentes políticos allegados a las esferas del gobierno son los más concurridos y tienen mejores asientos; ello es debido más que a la influencia que puedan ejercer sobre los jueces, a la creencia popular de la existencia de tal influencia". 2 *Ética de la Abogacía*, 1940, pág. 117.

Existe, además, otra dimensión en cuanto a los miembros de la Judicatura. Hay "abogados legisladores, abogados altos funcionarios y abogados influyentes en los actos de gobierno y de administración. *Entre esos actos están el nombramiento y el ascenso de los jueces y, al contrario, también su preterición.* Esos abogados ejercen su profesión más o menos activamente, sobre todo en épocas de crudo predominio partidario. Y si la función pública o legislativa les impide una exclusiva dedicación a la profesión, otros abogados les sustituyen en ésta, o colaboran en sociedad o aparcería. Lo que se mantiene entonces es el poder e influencia del 'estudio'. *Así, pues, con el advenimiento del partido al gobierno, el estudio de Fulano, o el de Zutano, ven de pronto aumentar la clientela en manera extraordinaria.* Lo que entonces busca el cliente no es un jurista; es un abogado en situación de 'lograr éxito' en el tribunal; es el abogado político; el abogado influyente; mejor aún, en la 'firma' de este abogado". (Énfasis suplido.) R. Bielsa, *La Abogacía*, 3ra ed., Buenos Aires, Ed. Aleiledo-Perrot, 1960, pág. 377.

Se nos podrá tachar de idealistas y decir que esta dinámica es inevitable, pues forma parte de la conducta humana imposible de eliminar. Quizás sea así. Más bien nos inclinamos a pensar que es cuestión de intereses y conveniencias personales; rehusamos cercenarlo del orden moral. Si acaso, ello sería fundamento más que suficiente para reglamentarla o prohibirla. "El no reconocerlo así constituye una inmoralidad. Y aquí entramos en el nudo del conflicto. *Por razón de su cargo, estos funcionarios pueden ensanchar la esfera del bufete: influencias, posibilidades de favores, un proteccionismo discreto, le otorgan categoría especial, que es siempre reconocida y bien pagada.* Si contra esto no se dictan disposiciones conminatorias y se deja al libre juego de la vida, allá cada cual con su conciencia... La tolerancia de los demás no puede salvar las impudicias cometidas .... Señalo el hecho; que cada cual recoja las consecuencias." (Énfasis suplido.) Monge Bernal, *Justicia: la novela de un abogado*, citado en A. Fernández Serrano, *La abogacía en España y en el mundo*, Madrid, Librería Internacional de Derecho, 1955, Vol. I, pág. 194.

*motu proprio* infracciones a la Ley de Ética Gubernamental a base del conocimiento que pudiera adquirir, aunque no mediante el mecanismo formal de presentación de querella jurada por otra persona.

No debemos olvidar que es frecuente que la prensa del país saque a relucir información constitutiva de infracción a la Ley de Ética Gubernamental de parte de un empleado o funcionario público apoyándose en "fuentes de entero crédito" o "fuentes confiables" sin que divulguen el nombre propio del informante. En otras ocasiones, los funcionarios públicos encargados de hacer cumplir o de fiscalizar el cumplimiento de alguna ley, reciben información anónima sobre una infracción particular. Es usual reconocerle a dichos funcionarios la discreción para decidir si deben investigar o no la confidencia. Si lo hacen y se convencen de que la misma tiene base en algún hecho o documento concreto es natural que formulen los cargos o querellas de rigor a la persona de que se trate, con oportunidad de que el querellado responda y pueda defenderse de los cargos en un proceso rodeado de todas las garantías constitucionales. Si los funcionarios no pudieran investigar nada más que a base de querellas juradas, muchas de las situaciones que a diario suceden al margen de la ley, no serían descubiertas ni sus autores responsabilizados. En ausencia de un querellante con rostro y sometido a la caución juratoria de que nos habla el recurrente, es un poder inherente del Director Ejecutivo de la Oficina de Ética Gubernamental siempre llevar a cabo las indagatorias preliminares para separar el grano de la paja. Si el fardo trajo paja, y sólo paja, que lo descarte, pero si trajo grano para su molino, pues, que lo muela. Pero definitivamente el legislador no pudo tener la intención (ni la ley el efecto) de obligar al Director Ejecutivo de esta Oficina a meter la cabeza en la arena o, simplemente, a mirar para el otro lado cuando descubre *motu proprio* los hechos de la maldad. (Escolios omitidos.) *Exhibit* I, págs. 2–3.

## III

Tampoco hay duda alguna en cuanto a que la sociedad profesional *García, Malavé & Landa* no era una persona jurídica *independiente* de sus socios. Aun bajo una hipótesis contraria —incluso el manto encubridor de una corporación— si sería válidamente permisible ese tipo de desdoblamiento, *quaere*. A fin de cuentas, bajo la Ley de Ética

Gubernamental lo crucial radica en si en virtud de la contratación —inmediata o posteriormente— el funcionario o empleado se beneficia directa o indirectamente.

El peticionario señor Malavé no ha negado que se lucró por los contratos otorgados por la sociedad con agencias del Gobierno. Todo lo contrario, lo acepta. Y eso precisamente es lo vedado por el Art. 3.3(e) de la Ley de Ética Gubernamental, *supra*, a saber, que "[n]ingún funcionario o empleado público podrá ser parte *o tener algún interés en las ganancias o beneficios producto de un contrato de cualquier otra agencia ejecutiva* ...".