Francisco A. Besosa Quiñones y otros, demandantes y recurridos, *v.* Corporación Azucarera de Puerto Rico y otros, demandados y recurrentes.

Número: RE-93-33          *Resuelto:* 8 de febrero de 1995

*Ángel López Hidalgo*, de *Enrique Nassar Rizek Law Offices*, abogado de los recurrentes; *Jaime Sifre Rodríguez* e *Hilda M. Surillo Peña*, de *Sánchez Betances & Sifre*, abogados de los recurridos.

## SENTENCIA

La controversia que debemos dirimir versa sobre la interpretación del Art. 2 de la Ley de Ética de 1948, Ley Núm. 28 de 8 de junio de 1948 (3 L.P.R.A. ants. secs. 570–574). Este artículo establecía una veda a la celebración de contratos entre organismos gubernamentales y sus funcionarios, mediante los cuales dichos funcionarios derivaran un beneficio económico, sin el previo consentimiento del Gobernador.

## I

El 14 de agosto de 1979 el Sr. Francisco A. Besosa Quiñones y la Sra. Leticia Besosa Rubí otorgaron un contrato de arrendamiento de inmueble con la Corporación Azucarera de Puerto Rico (la Corporación) mediante el cual los primeros le arrendaron a la Corporación siete (7) fincas rústicas ubicadas en el área Oeste de Puerto Rico.

El referido contrato tenía como propósito permitirle a la Corporación la utilización de los terrenos arrendados para el cultivo de caña de azúcar o para cualquier otro uso agrícola mediante la aprobación del arrendador. A esos efectos,

la Corporación se comprometió, entre otras cosas, a: (1) nivelar el terreno de las fincas, (2) establecer en dichas fincas un sistema de riego, (3) pagar las contribuciones sobre la propiedad de los terrenos arrendados y, en la alternativa de que se eximiera del pago de éstas, dichas contribuciones tendrían que ser pagadas al arrendador, (4) pagar un canon de arrendamiento que incrementaría anualmente en proporción al aumento del precio promedio anual de la azúcar cruda y, por último, (5) sembrar retoños de uno, dos, tres y cuatro años en los terrenos arrendados.

Aunque la Corporación incumplió con cuatro (4) de las referidas cláusulas del contrato, pagó los cánones de arrendamiento establecidos. Ante esta situación, el 10 de agosto de 1987 el señor Besosa Quiñones y la señora Besosa Rubí presentaron una demanda mediante la cual solicitaron que se le ordenara a la Corporación el cumplimiento específico de las cláusulas y se le concediera una suma por concepto de los daños causados por el alegado incumplimiento. La Corporación contestó la demanda. Alegó que el contrato de arrendamiento era nulo o anulable a tenor con las leyes vigentes y que la prestación exigida resultaba onerosa e imposible de ejecutar. Así las cosas, los demandantes presentaron una moción de sentencia sumaria, en la cual solicitaron del tribunal que dictase una sentencia a su favor por no existir hechos en controversia. La Corporación se opuso.

Finalmente, y luego de analizar la abundante prueba documental presentada por las partes, el tribunal de instancia determinó que el contrato en controversia era válido. En consecuencia, ordenó a la Corporación que le diera cumplimiento a las obligaciones contraídas.

Inconforme con la sentencia, la Corporación acudió ante nos mediante un recurso de revisión. Decidimos revisar y expedimos el recurso.

## II

La Corporación plantea que el contrato celebrado entre ella y el señor Besosa Quiñones y la señora Besosa Rubí no fue consentido por el Gobernador de Puerto Rico y que, por lo tanto, es nulo. Los recurridos, por su parte, además de tratar de establecer que el señor Besosa Quiñones no era funcionario de la Corporación, por lo que no le aplicaba la veda sobre la contratación, alegaron que el requisito de consentimiento por parte del Gobernador no conlleva la nulidad total del contrato en controversia, sino su anulabilidad, y que, habiendo ya transcurrido el término para incoar una acción de anulabilidad de contrato, la acción presentada por la Corporación estaba prescrita.

El Art. 2 de la Ley Núm. 28, *supra,* 1948 Leyes de Puerto Rico 79, aplicable al momento en que se suscribió el contrato, disponía, en lo pertinente, que:

> Artículo 2.—Ningún organismo gubernamental podrá llevar a cabo un contrato en el que cualquiera de sus funcionarios o empleados tenga, directa o indirectamente, interés pecuniario, a menos que el Gobernador, previa recomendación del Secretario de Justicia lo autorice. Será anulable todo contrato que viole las disposiciones de esta sección.

El artículo citado era aplicable a los contratos celebrados entre un organismo o agencia gubernamental y uno de sus funcionarios. Por eso, para que la restricción dispuesta por el citado Art. 2 causara efecto debía establecerse que la parte que contratara con la agencia era funcionario de ella. Para ajustar el término "funcionario" a los propósitos de la citada disposición, éste debe interpretarse en un sentido completo.

El propósito de la restricción en la contratación entre un organismo gubernamental y sus funcionarios, mediante la cual los últimos devengan algún interés pecuniario, es "evitar que se ejerza privilegio o influencia indebida en la concesión u obtención de contratos". Op. Sec. Just. Núm.

51 de 14 de octubre de 1958. Véase Op. Sec. Just. Núm. 48 de 10 de diciembre de 1959.(¹)

Según el mencionado propósito, entendemos que no sólo un funcionario del organismo gubernamental con quien contrate podría ejercer influencia, sino también otro funcionario que mantenga un alto nivel de envolvimiento con la agencia con la que contrata, aunque oficialmente no sea empleado de dicho organismo. Además, sostener un contrato bajo estas condiciones crearía un conflicto de intereses entre los intereses personales del funcionario y los del organismo involucrado, los cuales le correspondería defender al mismo funcionario.

En el caso de autos, aunque el señor Besosa Quiñones no era funcionario propiamente de la Corporación, sino de la Administración de Fomento y Desarrollo Agrícola, éste participaba con regularidad en las reuniones de la Junta de Gobierno de la Corporación, así como en las reuniones de la Junta de Gobierno de la Autoridad de Tierras.(²) Sus participaciones en dichas reuniones eran en calidad de representante del Secretario de Agricultura, ya que el señor Besosa Quiñones fungió extraoficialmente como Ayudante del Secretario de Agricultura para los años en que se celebró el contrato. Nos parece claro que el señor Besosa Quiñones se encontraba en una posición donde podía ejercer influencias indebidas sobre el contrato a celebrarse. Por esta razón, concluimos que el recurrido Besosa Quiñones

---

(¹) La Ley de Ética de 1948, Ley Núm. 28 de 8 de junio de 1948 (3 L.P.R.A. ants. secs. 570–574), fue sustituida por la Ley Núm. 12 de 24 de julio de 1985, Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1801 *et seq.* El Art. 3.3 de la Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 1823, mantuvo la prohibición establecida en el Art. 2 de la Ley de Ética de 1948 (3 L.P.R.A. ant. sec. 571). El propósito de la nueva Ley de Ética Gubernamental del Estado Libre Asociado de Puerto Rico es crear un Código de Ética para los funcionarios de la Rama Ejecutiva, de manera que se garantice al Pueblo que dichos funcionarios no entren en conflictos de intereses ni puedan lucrarse del patrimonio del Pueblo. Exposición de Motivos de la Ley Núm. 12, *supra,* 1985 Leyes de Puerto Rico 708–709.

(²) La Corporación Azucarera de Puerto Rico fue creada por la Junta de Gobierno de la Autoridad de Tierras, a tenor con la facultad de la Autoridad para crear corporaciones subsidiarias. 28 L.P.R.A. sec. 242 *et seq.*

actuaba como funcionario de la Corporación y que, en consecuencia, le era aplicable la prohibición establecida por el Art. 2 de la Ley de Ética de 1948, *supra*.

Ahora bien, esto no resuelve el problema. Debemos dirimir si no cumplir con el requisito del consentimiento del Gobernador para la otorgación del contrato tiene el efecto de que éste sea totalmente nulo o meramente anulable.

De una lectura al Art. 2 de la Ley de Ética de 1948, *supra*, observamos que el término que utiliza dicha disposición para describir los contratos que se otorguen sin el consentimiento del Gobernador es el de "anulable". El concepto de *anulabilidad* difiere del de nulidad en que los actos anulables pueden ser confirmados, ya sea mediante el transcurso del tiempo o mediante una " 'declaración unilateral de voluntad de aquella parte a quien compete el derecho a impugnar ...' ". J. Puig Brutau, *Fundamentos del Derecho Civil*, 3ra ed., Barcelona, Ed. Bosch, 1988, T. II, Vol. I, pág. 312.

De otra parte, un acto nulo es inexistente y no es susceptible de subsanación, confirmación ni ratificación. La nulidad opera ipso jure, "sin necesidad de que exista intervención alguna de parte interesada o del organismo jurisdiccional". E. Vázquez Bote, *Derecho Civil de Puerto Rico*, San Juan, Eds. Jurídicas, 1972, T. I, Vol. 2, pág. 480. Por ello, una acción judicial de nulidad se limita a declarar la inexistencia del acto y destruir la apariencia de validez del negocio. Íd.

Por el contrario, un acto anulable es inicialmente eficaz; aunque desde su origen existe un defecto que podría invalidarlo. Puig Brutau, *op. cit.*, pág. 304. Por esta razón, la ley impone un término para ejercitar la correspondiente acción de anulabilidad.

Para que un contrato se perfeccione, deben estar presentes tres (3) elementos: consentimiento, objeto y causa. Art. 1213 del Código Civil, 31 L.P.R.A. sec. 3391. A ello podemos añadir lo expresado por Puig Brutau sobre la nu-

lidad radical de los contratos. Puig Brutau, citando a Vázquez Bote, expresa que "[n]ulo es el contrato 'que por falta de algún elemento esencial o porque contraviene un precepto legal, carece de la aptitud necesaria para generar la nueva situación jurídica (efectos jurídicos que traducen la intención prática) pretendida por las partes en el negocio, que el Derecho atribuye al tipo correspondiente". (Énfasis en el original.) Puig Brutau, *op. cit.*, pág. 286.

En la situación de marras, el precepto legal que contraviene el contrato en controversia es el Art. 2 de la Ley de Ética de 1948, *supra*, por cuanto el mismo establecía el requisito del consentimiento del Gobernador y el contrato se otorgó sin cumplir con este requisito. Debemos, pues, analizar el citado Art. 2 para determinar si la disposición se refiere a nulidad o anulabilidad del contrato.

Luego de estudiar diversas opiniones emitidas por el Secretario de Justicia en las cuales se analiza la posible consecuencia que tendría lo dispuesto por el Art. 2 de la Ley de Ética de 1948, *supra*, sobre la eficacia de un contrato celebrado entre un organismo gubernamental y uno de sus funcionarios sin el consentimiento del Gobernador, entendemos que la mencionada disposición se refiere a la anulabilidad del contrato involucrado. La facultad del Secretario de Justicia para solicitar la nulidad de dicho contrato es puramente discrecional, aunque se ha establecido que "solo en caso extraordinario en que en forma alguna esté afectado el intéres público y en que medien circunstancias de mucho peso, no ejerceremos dicha facultad". Op. Sec. Just. Núm. 13 de 24 de febrero de 1961, pág. 52. De esta manera, el Gobernador puede confirmar un contrato celebrado sin su consentimiento si las "circunstancias demuestran que se ha hecho de buena fe y que los servicios han sido prestados en la misma forma ...". Op. Sec. Just. Núm. 10 de 10 de junio de 1968, pág. 48. Véase, además, Op. Sec. Just. Núm. 26 de 14 de marzo de 1966. Concluimos, pues, que el

contrato objeto de revisión es anulable y como tal está sujeto al término dispuesto por nuestro Código Civil para instar la acción de anulabilidad correspondiente.

El Art. 1253 del Códigio Civil, 31 L.P.R.A. sec. 3512, establece un término de cuatro (4) años para ejercer una acción judicial de anulabilidad. Por ser el contrato en controversia meramente anulable, la parte que reclamara el defecto, en este caso la Corporación, contaba con cuatro (4) años para levantar el vicio que podría causar la ineficacia del contrato.

El contrato en controversia se otorgó el 14 de agosto de 1979 y no es sino hasta el 7 de agosto de 1987, o sea, ocho (8) años luego de otorgado, que la Corporación levanta la nulidad del mismo. Debido a que el contrato era anulable, la Corporación contaba con cuatro (4) años contados desde que se otorgó el contrato para incoar la acción que ahora presenta tardíamente. El contrato quedó confirmado por el transcurso del tiempo y por la inacción de a quien le correspondía ejercitar la acción de anulabilidad.

Concluimos, pues, que por ser el contrato en controversia anulable, la Corporación contaba con el término de cuatro (4) años para presentar una acción de nulidad. Debido a su inacción, el contrato quedó confirmado y es válido.

Por los fundamentos antes expuestos, *se dicta sentencia confirmatoria.*

Así lo pronunció, manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García disintió con una opinión escrita. El Juez Asociado Señor Rebollo López se inhibió. El Juez Asociado Señor Hernández Denton no intervino. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita.

*(Fdo.)* Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

"Lo que es 'influencia indebida' es algo que no puede verse, o[í]rse ni sentirse; más bien es conducta sutil e intangible. Por su naturaleza y dinámica, versa sobre hechos difíciles de demostrar judicialmente mediante prueba directa. Ciertamente es inimaginable que sea objeto de estipulación escrita o expresa en un contrato." *Casiano, Jr. v. Borintex Mfg. Corp.*, 133 D.P.R. 127, 129 (1993).

La decisión mayoritaria tiene el peligrosísimo efecto de circunvalar un estatuto (Ley de Ética de 1948, Ley Núm. 28 de 8 de junio de 1948 (3 L.P.R.A. ants. secs. 570–574)),[1] revestido del más alto interés público, aprobado para prohibir los contratos entre organismos gubernamentales y sus funcionarios, y así evitar unos beneficios económicos impropios dimanantes de estar éstos en posiciones de las cuales pueden proyectar influencias indebidas. Dicho dictamen, inintencionalmente, contribuye a erosionar los mecanismos de que el legislador ha dotado al Estado para combatir la corrupción gubernamental y velar celosamente por la sana erogación de los bienes públicos.

I

Sucintamente, la mayoría resuelve que el contrato de arrendamiento de siete (7) fincas propiedad de la familia Besosa, suscrito el 14 de agosto de 1979 por Francisco A. Besosa Quiñones (Ayudante Especial del Secretario de Agricultura) con la Corporación Azucarera de Puerto Rico —por cinco (5) años, prorrogable por cinco (5) más con la aprobación del arrendador Besosa— era "anulable" y, por lo tanto, sujeto al término de cuatro (4) años provisto por el

---

[1] Vigente al momento de suscitarse los hechos del presente caso. Fue derogado por la Ley Núm. 12 de 24 de julio de 1985 (3 L.P.R.A. sec. 1801 y siguientes), *que en esencia recoge igual normativa.*

947

Art. 1253 del Código Civil(²) para interponer como defensa su nulidad en una acción judicial. Concluyen que, como no fue hasta ocho (8) años después de otorgado que la Corporación Azucarera de Puerto Rico solicitó su nulidad, el transcurso del tiempo unido a esa inacción subsanó todo vicio que pudiera tener. Se fundamentan en la *doctrina tradicional civilista* para contratos anulables, cuyos efectos extienden a un estatuto especial (Ley de Ética), por el sólo hecho de que éste califica de igual forma como "anulables" los contratos con las características del que está ante nuestra consideración.

El Art. 2 de la citada Ley de Ética de 1948, disponía:

> ... Ningún organismo gubernamental podrá llevar a cabo un contrato en el que cualquiera de sus funcionarios o empleados tenga, directa o indirectamente, interés pecuniario, *a menos que el Gobernador, previa la recomendación del Secretario de Hacienda y el Secretario de Justicia, lo autorice.* Será *anulable* todo contrato que viole las disposiciones de este artículo. (Énfasis suplido.) 1948 Leyes de Puerto Rico 79.

Surge diáfanamente que el legislador quiso supeditar la validez de dichos contratos a que fueran autorizados por el Gobernador, luego de tener la recomendación de los Secretarios de Hacienda y de Justicia. No fue mero capricho legislativo exigir que los convenios de esta índole pasaran por la consideración de los máximos funcionarios encargados de velar la buena marcha del Tesoro y los asuntos legales del Estado, respectivamente, antes de ser aprobados o rechazados por el Primer Ejecutivo. La intervención y recomendación del Secretario de Hacienda implica una evaluación de que el contrato es de *buena fe*, esto es, indispensable; contiene condiciones económicas favorables al Estado; no conlleva una erogación innecesaria o irrazonable de fondos públicos, y representa el mejor negocio que puede hacerse en consideración a los factores que correspondan conforme su naturaleza. Y claro está, la participa-

---

(²) 31 L.P.R.A. sec. 3512.

ción del Secretario de Justicia presupone, desde el punto de vista jurídico, que los otorgantes están capacitados y que los términos acordados están claramente redactados, son completos y cumplen con los distintos preceptos de ley aplicables a los mismos en función, también, de su naturaleza.

Vemos, pues, que el punto de partida y regla general establecida por el legislador es una *clara prohibición* a ese tipo de contrato. *Como excepción*, se admite su validez *únicamente cuando se ha seguido el riguroso y restrictivo trámite delineado en la propia ley.* Como reconoce la mayoría, "[e]l propósito de la restricción en la contratación entre un organismo gubernamental y sus funcionarios, mediante la cual los últimos devengan algún interés pecuniario, es 'evitar que se ejerza privilegio o *influencia indebida* en la concesión u obtención de contratos'. Op. Sec. Just. Núm. 51 de 14 de octubre de 1958. Véase Op. Sec. Just. Núm. 48 de 10 de diciembre de 1959". (Énfasis suplido.) Opinión del Tribunal, pág. 4.

La norma que veda este tipo de contrato sólo puede ser superada *discrecionalmente* por el Gobernador.[3] Esa autorización, *por vía de excepción*, es *calificada y restringida*, y no puede utilizarse para obviar otros requisitos de ley. Op. Sec. Just. Núm. 45 de 5 de septiembre de 1958, págs. 240–241 (Lcdo. Francisco Espinosa, Jr.).

---

[3] "En una serie de opiniones emitidas por este Departamento, interpretando la Ley Núm. 28 de 1948, hemos sostenido el criterio de que la Asamblea Legislativa de Puerto Rico, contemplando la posibilidad de que en algunos casos sería necesario e indispensable que un organismo gubernamental efectúe un contrato en el que alguno de sus funcionarios o empleados tenga, directa o indirectamente, interés pecuniario, tuvo a bien conferirle discreción al Gobernador de Puerto Rico para que, de acuerdo con su mejor criterio, autorice dichos contratos, con miras a obviar el principio en que descansa la prohibición enunciada, y en esta forma salvaguardar los intereses públicos." Op. Sec. Just. Núm. 6 de 8 de febrero de 1956, pág. 24 (Lcdo. José Trías Monge).

## II

Yerra la mayoría al adjudicar a la Asamblea Legislativa la intención de conferir igual extensión y significado a la palabra "anulable" que las que se reconocen a innumerables negocios jurídicos *cuyo interés público no es de tan alta envergadura como la de los contratos entre organismos gubernamentales y sus funcionarios.*

Sabemos que la negociación indiscriminada con el ente gubernamental podría redundar en vicios a la larga desestabilizadores de la recta gestión pública en general, y el fisco en particular. Por ello resulta imperativo que el Estado tome medidas cautelares apropiadas para atajar a tiempo esos posibles problemas. Ante la clara prohibición legal, sólo por excepción se permite la contratación. Cuando no concurren los requisitos considerados por el legislador, ¿qué significado tiene la palabra "anulable" en la Ley de Ética?

Ciertamente no es posible interpretar que la aquiescencia del Gobernador —pasividad— durante el período de cuatro (4) años fijado en el ámbito de la doctrina civilista para levantar su nulidad tiene el efecto de ratificar el contrato viciado. No podemos ignorar que el estatuto *requiere* una *acción afirmativa* del Primer Ejecutivo, *de carácter enteramente discrecional*, que no debe ejercerse indiscriminadamente, sino *excepcionalmente* cuando los contratantes, con el concurso de los Secretarios de Hacienda y de Justicia, le proveen los elementos de juicio que ponen en posición de determinar que el contrato es merecedor de soslayar la prohibición general de ley.

La consistente interpretación de los distintos Secretarios de Justicia, a los efectos de exigir una acción afirmativa del Primer Ejecutivo que refleje una clara intención de convalidar, es derivado lógico del reconocimiento de una patente realidad que se suscita en el Estado moderno; esto es, la dilución del contacto directo del principal dirigente

gubernamental de un país con gran parte de los actos que conllevan el desembolso de fondos públicos. El complejo entramado gubernamental puertorriqueño ineluctablemente conlleva que la participación del Gobernador, en el devenir de muchos asuntos de gestión pública, sea menos directa, activa e intensa de lo deseado.

En atención a la imposibilidad práctica de que el Primer Ejecutivo siga idóneamente la pista de toda gestión gubernamental —como sucede cuando se celebran contratos entre las agencias administrativas del Gobierno y sus funcionarios sin el aval ejecutivo— el legislador ha querido que convenios del tipo aquí descrito que se efectúan sin su anuencia se presenten a posteriori a su consideración y que, discrecionalmente, éste pueda *convalidarlo mediante un acto afirmativo*. Este sabio esquema legislativo fue diseñado para evitar las influencias indebidas y, a la par, proteger al máximo jerarca gubernamental de las marejadas políticas y hábiles maniobras de funcionarios que aspiren obtener beneficios de un codiciado presupuesto público, aprovechando en dicha empresa las naturales cortapisas que a una ideal fiscalización impone el intrincado andamiaje gubernamental.

El uso del vocablo "anulable" es a los únicos efectos de permitir al Gobernador, en circunstancias excepcionales debidamente acreditadas, ratificar un contrato sin que la nulidad absoluta ab initio sea un obstáculo insalvable. Incluso se ha expresado que no es deseable la práctica de ratificar los contratos luego de otorgados sin observarse estrictamente los requisitos de ley, pues la autorización del Gobernador debe, naturalmente, obtenerse *antes* de la contratación. Sin ese orden lógico, por excepción, pueden validarse los contratos viciados si se demuestra que se hicieron de *buena fe*. Op. Sec. Just. Núm. 25 de 14 de marzo de 1966, págs. 132–133 (Lcdo. Rafael Hernández Colón).

Evidentemente el significado lógico de la palabra "anulable" es que un contrato que no cumpla con los requisitos

de ley no está irremediablemente herido de muerte, sino que en unas circunstancias apropiadas y estrictas puede convalidarse durante su vigencia mediante la aprobación del Primer Ejecutivo si se demuestra que fue hecho y prestado de buena fe. Op. Sec. Just. Núm. 10 de 10 de junio de 1968, pág. 40 (Lcdo. José C. Aponte).

Y enfatizamos, para que el Gobernador discrecionalmente lo ratifique es imperativo que en el proceso de convalidación se cumpla con el deber de brindar información suficiente que le permita emitir un criterio informado. Op. Sec. Just. Núm. 45 de 2 de noviembre de 1959, pág. 209 (Lcdo. Hiram R. Cancio).

En resumen, la ratificación discrecional susceptible de ser dada por el Gobernador requiere unos actos afirmativos e indubitados de una intención de convalidar; *no basta el mero transcurso del tiempo para curar vicios*. En recta hermenéutica, no podemos automáticamente extender la normativa civilista sobre ratificación a esta importante dimensión de política pública. No es posible dar eficacia jurídica a este tipo de contrato, con el solo transcurso del tiempo, *sin que lo acompañe ningún acto afirmativo del Ejecutivo*.

## III

Aparte de lo expuesto, existen varios hechos y circunstancias que, juzgados en conjunto, prima facie son indicadores de que efectivamente medió una posible *influencia indebida* en el otorgamiento del contrato. Ello nos lleva a concluir que éste jamás hubiese sido ratificado durante su vigencia por el Primer Ejecutivo a la luz del criterio de *buena fe y demás factores pertinentes*.

Los autos reflejan a simple vista los términos *particularmente beneficiosos* para el señor Besosa Quiñones. Así se desprende de las cartas del Director y el Ejecutivo interino de la Corporación Azucarera de Puerto Rico al Secre-

tario y Subsecretario de Agricultura, que expresaban: que las conversaciones conducentes al contrato con el señor Besosa Quiñones *no resultaban fructíferas debido a las condiciones especiales que éste solicitaba,* las cuales "establecen *precedentes* en el procedimiento de arrendamiento de fincas a la Corporación Azucarera" (Caso Núm. RE-93-33, Parte I, Apéndice, pág. 260); su criterio de "que la Corporación Azucarera no debería someterse a condiciones tan desfavorables" (íd., pág. 261); la *oferta final* hecha el 14 de junio de 1979 por el Director Ejecutivo de la Corporación Azucarera de Puerto Rico al señor Besosa Quiñones, comunicándoselo así claramente, y la escueta comunicación del Director Ejecutivo de la Corporación Azucarera de Puerto Rico el 28 de julio de 1979 *diciendo expresamente que había sido instruido por el Secretario de Agricultura,* de quien el señor Besosa Quiñones era ayudante especial, para que preparara el Contrato de Arrendamiento del señor Besosa Quiñones a base de los términos que él solicitaba (Caso Núm. RE-93-33, Parte I, Apéndice, pág. 270).

Además, de la Certificación Núm. 10-84 de la Junta de Gobierno de 24 de marzo de 1988 surge que el contrato otorgado a favor del señor Besosa Quiñones *nunca fue sometido a dicha Junta,* ni por ende aprobado, como exigía el Reglamento de la Corporación Azucarera de Puerto Rico cuando la propiedad a adquirirse o las mejoras sobrepasaran $25,000.

## IV

Finalizamos este disentir expresando nuestra preocupación por los efectos nefastos al orden público y la desestabilidad del erario que podría producir la decisión mayoritaria. Es de conocimiento general la cantidad y complejidad de asuntos que corresponde atender al Gobernador. En atención a ello, la Asamblea Legislativa ideó y diseñó unos mecanismos para velar adecuadamente

la buena marcha de los asuntos públicos. Con anterioridad al día de hoy, la Ley Núm. 12, *supra*, tal como fue redactada y posteriormente interpretada, constituía un efectivo instrumento para velar por la pureza de los contratos entre las agencias gubernamentales y sus funcionarios.

Es claro el propósito principal de *prohibir* este tipo de contrato y, sólo mediante vía excepcional, aprobarlos si cumplen con estrictos requisitos de recomendación por parte de los Secretarios de Justicia y de Hacienda y, subsiguientemente, la aprobación del Primer Ejecutivo.

En el supuesto de que dichos requisitos no se cumplan inicialmente —la mejor práctica es obtener el permiso previamente— las partes pueden *solicitar* al Gobernador su ratificación. Queda a su entera discreción hacerlo, *siempre que la información* brindada revele que el contrato en cuestión se hizo de buena fe y así mismo se prestaron los servicios. Lógicamente, en atención al supuesto de que el Primer Ejecutivo pueda ratificar el contrato así viciado, es que se utilizó la palabra "anulable". *Si la Asamblea Legislativa hubiera optado por "nulo", no existiría posibilidad alguna de ratificación ejecutiva mediante un acto afirmativo demostrativo de su intención de convalidar.*

Todo este cuidadoso esquema delineado por el legislador y perfilado consistentemente por los distintos Secretarios de Justicia de escrutar eficazmente los contratos entre las agencias del Gobierno y los funcionarios o empleados públicos con intereses pecuniarios para evitar el uso de influencias indebidas que perjudican al fisco y a la sana administración pública, ha sufrido una dura estocada con el mallete mayoritario.

Se abren las puertas al ingenio y a la creatividad de quienes sepan idear hábiles estrategias para burlar los mecanismos de fiscalización diseñados por ley. Esta decisión es verdaderamente lamentable en nuestro Sistema de Gobierno —en que el mandato constitucional de funcionarios electos dura cuatro (4) años— ya que la experiencia nos

dice que muchos contratos, por regla general, no están sujetos al escrutinio público hasta después de advenir al poder una administración distinta. Si logran evadir el escrutinio gubernamental por los cuatro (4) años próximos al otorgamiento del contrato, le habrán validado automáticamente.

No podemos suscribir tan grave INJUSTICIA al pueblo de Puerto Rico.